[No. G045622. Fourth Dist., Div. Three. Dec. 12, 2012.]

BANNING RANCH CONSERVANCY, Plaintiff and Appellant, v. CITY OF NEWPORT BEACH et al., Defendants and Respondents; NEWPORT BANNING RANCH LLC et al., Real Parties in Interest and Respondents.

## COUNSEL

Shute, Mihaly & Weinberger, Rachel B. Hooper, Amy J. Bricker and Sara A. Clark for Plaintiff and Appellant.

Aaron Harp, City Attorney, Kyle E. Rowen, Deputy City Attorney; Remy Moose Manley, Whitman F. Manley and Jennifer S. Holman for Defendants and Respondents.

Manatt, Phelps & Phillips and Susan K. Hori for Real Parties in Interest and Respondents.

OPINION

IKOLA, J.—Plaintiff Banning Ranch Conservancy appeals from the denial of its petition for a writ of mandate directing the City of Newport Beach (City) to vacate certification of an environmental impact report (EIR) for the development of Sunset Ridge Park.

Plaintiff contends the EIR wrongly defined the project to exclude the pending residential and commercial development on an adjacent property, Banning Ranch. It claims the park and development are one interrelated project to which the City is giving improper "piecemeal" review.

In addition, plaintiff asserts the EIR was substantively inadequate in five ways. It contends the EIR insufficiently analyzed the park's cumulative traffic impact, growth-inducing impact, cumulative biological impact, impact on the California gnatcatcher's habitat, and consistency with the California Coastal Act of 1976 (Coastal Act) (Pub. Resource Code, § 30000 et seq.).

We disagree with plaintiff's contentions, and affirm. First, the EIR's project definition properly excluded the neighboring development, which is not a reasonably foreseeable consequence of the park. The two are separate projects with different proponents, serving different purposes. Second, the EIR adequately analyzes the park's environmental impact. Substantial evidence supports its conclusions, and the City did not prejudicially abuse its discretion by approving it.

FACTS

*The Park, Banning Ranch, and the General Plan*

The City bought land at the northwest corner of West Coast Highway and Superior Avenue in 2006. The parcel is roughly anvil shaped. The anvil's "base" faces roughly southwest, and runs along West Coast Highway. A scenic easement bars pavement or structures over the southern portion. The horn of the anvil (the protruding part) faces roughly southeast, and runs along a curved section of Superior Avenue. The top of the anvil faces roughly northeast and borders a residential neighborhood of the City. The remaining side of the anvil, opposite the horn, faces west.

This western boundary abuts property commonly known as Banning Ranch, which is controlled by Newport Banning Ranch LLC (NBR LLC). Banning Ranch covers over 400 "primarily undeveloped" acres previously used for oil production. The property is roughly California shaped. Its northern boundary runs contiguous to 19th Street in Costa Mesa, and largely

borders a regional park. The northern half of its western boundary runs parallel to the Santa Ana River. The southern half of its western boundary curves south and east, approaching West Coast Highway. The property's southern boundary runs along West Coast Highway. The southernmost section of the property's eastern border abuts the City's parcel.

Also in 2006, the City adopted a general plan to achieve the vision of what "residents want Newport Beach to be now and in 2025." The general plan "focuses on conserving the existing pattern of land uses," and "establishes strategies for [the] enhancement and revitalization" of "areas of the City that are not achieving their full potential." Reaching beyond "lands within the jurisdiction of the City of Newport Beach," the general plan "also specifies policies for the adopted Sphere of Influence (SOI), encompassing Banning Ranch, which represent the City's long-term intentions for conservation and development of the property should it be annexed to Newport Beach. Until that time, uses and improvements of the property are subject to the County of Orange General Plan."

In the introduction, the general plan states the City will "[s]upport[] efforts to acquire Banning Ranch for permanent open space." But failing that, the general plan contemplates developing Banning Ranch. Land use policy 3.4 of the "Land Use Element" provides, "Prioritize the acquisition of Banning Ranch as an open space amenity for the community and region, consolidating oil operations, enhancing wetland and other habitats, and providing parkland amenities to serve nearby neighborhoods. If the property cannot be acquired within a time period and pursuant to terms agreed to by the City and property owner, allow for the development of a compact residential village that preserves the majority of the site as open space and restores critical habitat . . . ." Similarly, a "POLICY OVERVIEW" provides, "The General Plan prioritizes the acquisition of Banning Ranch as an open space amenity for the community and region. Oil operations would be consolidated, wetlands restored, nature education and interpretative facilities provided, and an active park developed containing playfields and other facilities to serve residents of adjoining neighborhoods. [¶] Should the property not be fully acquired as open space, the Plan provides for the development of a concentrated mixed-use residential village that retains the majority of the property as open space."

The general plan states the City intends to "[c]onstruct the circulation system described on the map entitled Newport Beach Circulation Element—Master Plan of Streets and Highways . . . ." The "Master Plan of Streets and Highways" indicates two unbuilt "Primary Roads" on Banning Ranch. One road starts on West Coast Highway and proceeds north before curving east. The other starts on West Coast Highway and winds north all the way to 19th Street. The Orange County Transportation Authority's "Master Plan of Arterial Highways" shows different potential roads crossing Banning Ranch.

*The Newport Banning Ranch Project*

In March 2009, the City announced it was acting as the lead agency to prepare an EIR "for the Newport Banning Ranch Project." It reported in its notice of preparation: "The Newport Banning Ranch Project (Project) proposes the development of up to 1,375 residential dwelling units, 75,000 square feet of commercial uses, and 75 overnight resort accommodations on a Project site of approximately 401 acres." Because "[a] majority of the Project site is located in the unincorporated Orange County area . . . [a]s a part of the Project, these unincorporated areas would be annexed to the City."

The City reported the Newport Banning Ranch (NBR) "development would be constructed from south to north," "starting in the southern portion of the Project site closest to West Coast Highway." Yet "[p]ublic access to the Project does not currently exist."

Thus, the NBR project needed an access road. The City stated, "[t]he primary entrance to the Project site is proposed from West Coast Highway," which "may require the widening of a portion of the northern side of West Coast Highway." It described: *"**Bluff Road**. As a part of the project, Bluff Road would be constructed from a southern terminus at West Coast Highway to a northern terminus at 19th Street. . . . [¶] Bluff Road would serve as the primary roadway through the Project site . . . . The implementation of Bluff Road may be phased." The road would be a "Primary Arterial," which is "usually a four-lane, divided roadway. . . . designed to accommodate . . . a typical daily capacity of 34,000 vehicles per day."

And in the notice of preparation, the City repeatedly referred to its plans to build a park. Its description of Banning Ranch's neighbors included "[t]he City of Newport Beach's proposed Sunset Ridge Park, located contiguous to the Project site's southeastern boundary." "Sunset Ridge Park" is conspicuously labeled on the "Surrounding Land Uses" diagram. The park is identified on the "Conceptual Master Land Use Plan," which also shows the planned location for Bluff Road (labeled "North Bluff Road" and "South Bluff Road"). Finally, the City stated, "Access into the City of Newport Beach's proposed Sunset Ridge Park is proposed from Bluff Road within the Project site."

*The Sunset Ridge Park Project*

Two months after the City issued the NBR notice of preparation, it issued a notice of preparation for the park project. It "propose[d] to develop the approximate 18.9-acre site with active and passive recreational uses and an access road to the park through Newport Banning Ranch. The access road

would be constructed from West Coast Highway to Sunset Ridge Park through the Newport Banning Ranch site (5.2 of the 18.9 acres)." The City further described the access road it would build: "As a part of the project, a park access road would be constructed from West Coast Highway through Newport Banning Ranch (a private property) to the park. Use of this adjacent property would require an access easement from the Property Owner. . . . [¶] As part of the proposed project, the City proposes the widening of a portion of the northern side of West Coast Highway from Superior Avenue to a point west of the access road . . . . Additionally, the City is proposing a signal on West Coast Highway at the proposed access road."

The site plan shows the planned park, the access road, and what appears to be the property line between the City's parcel and Banning Ranch. Only once in the park notice of preparation does the City disclose that Banning Ranch is "proposed for development by Newport Banning Ranch."

The City issued its draft EIR for the park project in October 2009. It retained BonTerra Consulting to prepare the draft EIR—the same consultant preparing the EIR for the NBR project.

The draft EIR analyzed the park's access road. It noted: "The road would extend northward from West Coast Highway for about 850 feet, and then would follow a northwest-to-southeast alignment for about 550 feet to connect to the park parking lot." The road for the most part "would be constructed as a 28-foot-wide undivided roadway with 2 travel lanes." It projected the park would generate 173 vehicle trips daily.

The draft EIR also analyzed the proposed signal on West Coast Highway. It noted the general plan already "assumes a roadway extension north through the Newport Banning Ranch property to 19th Street, with additional connections at 15th and 17th Street with or without development of that property. The park access road would also serve as one of the access points from the public street system to any future development on the Newport Banning Ranch property; widening of the park access road would be required." Because the general plan "designates the Newport Banning Ranch property as Open Space/Residential Village," "the signal warrants were conducted for General Plan buildout under both General Plan scenarios for the Newport Banning Ranch property." Whether Banning Ranch is used as open space or developed as a residential village, "[t]he estimated average daily traffic . . . volume on the park access road approach to West Coast Highway is forecasted to exceed the minimum volume requirements" (at least 3,200 vehicles per day) warranting a traffic signal.

Plaintiff submitted comments to the City during the public review period. Plaintiff's planning consultant contended the draft EIR had "piecemealed" the

project by "fail[ing] to fully acknowledge the full extent of the project." She noted "it appears that the 'park access road' " in the draft EIR for the park and the "Bluff Road" in the NBR notice of preparation "are one and the same." The planning consultant further asserted the draft EIR failed to analyze the park's growth-inducing impacts. Plaintiff's biological consultant commented the draft EIR "failed to detect up to a half-acre of wetlands" and "fail[ed] to evaluate" the significance that "the entire project site is designated as critical habitat for the California gnatcatcher . . . ."

The City responded to the public comments and prepared a final EIR. In a series of "Topical Responses," the City addressed concerns about the access road and the NBR project. The City conceded "the proposed Sunset Ridge Park Project and the proposed Newport Banning Ranch Project assume the generally same roadway alignment from West Coast Highway." It also "acknowledge[d] that the proposed park alone would not generate enough traffic to warrant a traffic signal."

But the City "respectfully disagree[d]" with commenters who "suggested that the proposed Newport Banning Ranch Project is a part of the Sunset Ridge [Park] Project and therefore should be analyzed in one EIR and [as] a signal project." It noted both the general plan and the county master plan "depict a north-south roadway"—"a four-lane, divided roadway"—"through the Newport Banning Ranch property extending from West Coast Highway to 19th Street." The City stated, "a Primary Road would be constructed through the Newport Banning Ranch property from West Coast Highway to 19th Street" "whether the Newport Banning Ranch property is developed in the future or whether it is acquired for open space . . . ." It asserted that even if Banning Ranch was used as open space, the general plan provided for "nature education and interpretative facilities and an active park containing playfields and other facilities to serve residents of adjoining neighborhoods; and the construction of the north-south Primary Road extending from West Coast Highway to a connection with an east/west arterial roadway." And "under future conditions, with the completion of a road in this location . . . the intersection of the park access road with West Coast Highway would warrant a signal."[1]

And the City maintained the two projects were distinct. It stated, "Neither the proposed Sunset Ridge Park Project nor the proposed Newport Banning Ranch Project must be approved or constructed in order for one or both of the proposed Projects to be implemented. Neither the Sunset Ridge Park Project

[1] One commenter forwarded an e-mail from a Caltrans representative who conceded: "the proposed traffic signal is not for the sole purpose of providing access to Sunset Ridge Park. This signal will be the main access to the future Banning Ranch development . . . the main reason behind [the signal] is to provide motorists access to the Banning Ranch Development."

EIR nor the Newport Banning Ranch Project EIR, the latter under preparation, assumes that any component of either Project has been implemented."

In specific response to plaintiff's piecemealing objection, the City claimed the Banning Ranch easement for the park access road "is intended to be independent and does not presuppose development by the Newport Banning Ranch applicant." The city council passed a resolution certifying the final EIR at a public hearing on March 23, 2010.

At the same hearing, the City also approved an "**ACCESS AGREE-MENT**" between it and NBR LLC. The recitals provided the "[p]arties desire to enter into this Access Agreement to facilitate City's economical and efficient development of Sunset Ridge Park while not precluding NBRLLC's access to and economical and efficient use of the NBR Property." NBR LLC agreed to grant a nonexclusive easement to the City to build and maintain an access road to the park.

In exchange for the Banning Ranch easement, the City agreed to "design and construct the Access Road Improvements from West Coast Highway to [the park] to match the proposed vertical and horizontal alignment of the east side of the proposed Bluff Road."[2] The agreement provided the "City's preferred route for gaining access to the [park] will be pursuant to the route reference in the [park] Project EIR as EIR Option 1 . . . ." But if "conditions require the Access Road Improvements be built according to any alignment, other than EIR Option 1," the City agreed "to the future relocation of all portions of the Access Road Improvements that are not on the ultimate alignment of Bluff Road." The City agreed to construct "[t]he proposed Bluff Road and West Coast Highway intersection" and, with Caltrans' approval, the "City will install a new signal at Bluff Road and West Coast Highway." Further, the "City will widen and improve the northerly side of West Coast Highway from Superior Road to Bluff Road to its ultimate general plan width (to accommodate a double left turn lane on eastbound West Coast Highway) as part of the Project." The City agreed to "provide 60% completed drawings, plans and calculations and final engineering and landscaping plans for the proposed Access Road Improvements[] on the Easement Area to NBRLLC for review, comment, and approval."

Plaintiff filed a petition for a writ of mandate in April 2010, and later filed a supplemental petition. The court denied the petition in May 2011. It found "substantial evidence supports the City's finding that the CEQA[3] review

---

[2] Before the City issued either the NBR or park notice of preparation, an assistant city engineer lamented to the city's environmental consultant: "We are going through a lot of pain to get [NBR LLC's] road in at their grades."

[3] California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

could be limited to the Park itself. The Court finds that the EIR properly focused on the Park Project and that there was no improper 'piece-mealing.' " It further found substantial evidence showed there was no cumulative effect of growth-inducing impact for the EIR to address. And it concluded substantial evidence supported "the City's biological EIR and mitigation proposals."

## DISCUSSION

*CEQA, EIRs, and Piecemealing*

■ "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment." (*Laurel Heights, supra,* 47 Cal.3d at p. 390.) "[A]n EIR is 'an informational document' . . . ." (*Id.* at p. 391.) Its purpose " 'is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Ibid.*)

■ "Project" is a term of art. "CEQA broadly defines a 'project' as 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . . [¶] . . . [¶] . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.' [Citation.] [¶] The statutory definition is augmented by the Guidelines [(Cal. Code Regs., tit. 14, § 15000 et seq.)], which define a 'project' as *'the whole of an action,* which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . .' " (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1222 [66 Cal.Rptr.3d 645] (*Tuolumne County*).)

■ "Under CEQA, the public is notified that a draft EIR is being prepared [citations], and the draft EIR is evaluated in light of comments received. [Citations.] The lead agency then prepares a final EIR incorporating

comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. [Citations.] The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project. [Citation.] Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (*Laurel Heights, supra*, 47 Cal.3d at p. 391, fn. omitted.)

■ "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' "[4] (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

■ "Consequently, like so many other matters in life, timing in EIR preparation is essential." (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1358 [111 Cal.Rptr.2d 598] (*Berkeley Jets*).) An EIR " 'should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment.' " (*Laurel Heights, supra*, 47 Cal.3d at p. 395.) "[T]he later the environmental review process begins, the more bureaucratic and financial momentum there is behind a proposed project, thus providing a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project. This problem may be exacerbated where, as here, the public agency prepares and approves the EIR for its own project." (*Ibid.*) "Environmental review which comes too late runs the risk of being simply a burdensome reconsideration of decisions already made and

---

[4] An EIR is also "a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.) "[T]he People have a right to expect that those who must decide will approach their task neutrally, with no parochial interest at stake. Of course, we do not impugn the motives and integrity of the officials of the particular city involved in the present dispute. Speaking generally, therefore, it seems clear that the officials of a municipality, which has cooperated with a developer to the extent that it requests an annexation of that developer's property for the express purpose of converting it from agricultural land into an urban subdivision, may find it difficult, if not impossible, to put regional environmental considerations above the narrow selfish interests of their city." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017] (*Bozung*).)

becoming the sort of '*post hoc* rationalization[] to support action already taken,' which our high court disapproved in [*Laurel Heights*]." (*Berkeley Jets, supra*, 91 Cal.App.4th at p. 1359.)

Accordingly, "CEQA forbids 'piecemeal' review of the significant environmental impacts of a project." (*Berkeley Jets, supra*, 91 Cal.App.4th at p. 1358.) Agencies cannot allow "environmental considerations [to] become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung, supra*, 13 Cal.3d at pp. 283–284 [EIR required when city annexed land for anticipated development].)

The California Supreme Court set forth a piecemealing test in *Laurel Heights*. "We hold that an EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights, supra*, 47 Cal.3d at p. 396.) "Under this standard, the facts of each case will determine whether and to what extent an EIR must analyze future expansion or other action." (*Ibid.*)

Applying this test, the *Laurel Heights* court held a university wrongly piecemealed the environmental review of the relocation of its pharmacy school. The EIR analyzed the school's initial move into 100,000 square feet of a building. (*Laurel Heights, supra*, 47 Cal.3d at p. 393.) It failed to "discuss the additional environmental effects, if any, that will result from [the university's] use of the remaining 254,000 square feet when it becomes available" after a tenant's long-term lease expired. (*Ibid.*) But school officials had publicly announced their intention to use the whole building. (*Id.* at p. 397.) And "[t]he draft EIR acknowledged that [the university] will occupy the entire Laurel Heights facility when the remainder of the space becomes available." (*Id.* at p. 396.) Thus, "the future expansion and general type of future use is reasonably foreseeable" and required analysis in the EIR. (*Ibid.*)

■ This is where the law gets murky. "Reasonably foreseeable" is a familiar concept, but the courts have not comprehensively explored the meaning of "consequence" in this context. The cases tend to be fact driven, as predicted. (See *Laurel Heights, supra*, 47 Cal.3d at p. 396.) And the legal analysis can tend toward circularity. (See, e.g., *National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1519 [50 Cal.Rptr.2d 339] [landfill EIR could exclude processing plants partly because "the design of the landfill treats them as separate projects"]; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1358 [272

Cal.Rptr. 372] [no piecemealing because "[t]here were two separate projects"].) The project definition is the starting point of a piecemealing challenge, not the finish line. The whole question is whether the project definition is correct.

The piecemealing case law defies easy harmonization. Still, we can group the leading cases by their stated reasoning into some potentially useful categories.

First, there may be improper piecemealing when the purpose of the reviewed project is to be the first step toward future development. (See, e.g., *Laurel Heights, supra,* 47 Cal.3d at p. 398 [university planned to occupy entire building eventually]; *Bozung, supra,* 13 Cal.3d at pp. 269–270 [city annexed land so it could rezone it for development]; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 244 [227 Cal.Rptr. 899] [county rezoned land as "a necessary first step to approval of a specific development project"]; *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1337 [232 Cal.Rptr. 507] (*Antioch*) [negative declaration wrongly issued; "the sole reason" city approved road and sewer construction was "to provide a catalyst for further development"]; see also *Antioch*, at p. 1336 ["[c]onstruction of the roadway and utilities cannot be considered in isolation from the development it presages"].)

And there may be improper piecemealing when the reviewed project legally compels or practically presumes completion of another action. (*Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 272 [118 Cal.Rptr.3d 736] [EIR for reclamation plan should have included mining operations that necessitated it]; *Tuolumne County, supra,* 155 Cal.App.4th at p. 1231 [home improvement center "cannot be completed and opened legally without the completion of [a] road realignment"]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 732 [32 Cal.Rptr.2d 704] [EIR for residential development should have included sewer expansion that was a "crucial element[]" of development]; *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96] (*Plan for Arcadia*) [shopping center, parking lot, and adjacent road widening "should be regarded as a single project"].)

On the other hand, two projects may properly undergo separate environmental review (i.e., no piecemealing) when the projects have different proponents, serve different purposes, or can be implemented independently. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 99 [108 Cal.Rptr.3d 478] (*CBE*) [refinery upgrade and construction of pipeline exporting excess hydrogen from upgraded refinery were "independently justified separate projects with different project proponents"]; *Planning & Conservation League v. Castaic Lake Water Agency*

(2009) 180 Cal.App.4th 210, 237 [103 Cal.Rptr.3d 124] (*Castaic Lake*) [water transfer had "significant independent or local utility" from broader water supply agreement, and would be implemented with or without it]; *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 699 [27 Cal.Rptr.3d 223] (*West Side Irrigation*) [two water rights assignments to city were "approved by different independent agencies" and "could be implemented independently of each other"]; *Plan for Arcadia, supra,* 42 Cal.App.3d at p. 724 [shopping center EIR could exclude road work the city had "long before" decided would be needed due to new freeway].)[5]

*The Park Project Is Not Receiving Improper Piecemeal Review*

Plaintiff contends the EIR incorrectly defined the project to include only the park and the access road. It asserts the whole of the action includes the NBR project—in other words, the park project and the NBR project are one project the City is improperly reviewing in piecemeal fashion. We independently determine whether this is so. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*) [whether EIR should have evaluated "the project's foreseeable future uses" was properly reviewed "as a matter of law"]; *Tuolumne County, supra,* 155 Cal.App.4th at p. 1224 ["the question concerning which acts constitute the 'whole of an action' . . . is a question of law"]; *CBE, supra,* 184 Cal.App.4th at p. 98 [applying de novo review to piecemealing claim].)

This case meets part of the *Laurel Heights* test—the NBR project is reasonably foreseeable. (*Laurel Heights, supra,* 47 Cal.3d at p. 396.) It is imminent, in fact. NBR LLC has already proposed developing Banning Ranch, and the City is already preparing an EIR for the NBR project. These specific, pending plans distinguish cases rejecting piecemealing claims on the ground the future actions were too speculative. (See, e.g., *Berkeley Jets, supra,* 91 Cal.App.4th at p. 1361 [airport EIR could omit future projects that "existed only as concepts in long-range plans that were subject to constant revision"]; *National Parks & Conservation Assn. v. County of Riverside, supra,* 42 Cal.App.4th at p. 1518 [landfill EIR could omit detailed analysis of processing plants because "it is not known where [the plants] will be situated and who will be operating them"]; *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 736 [12 Cal.Rptr.2d 785], disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995)

---

[5] (But see *Tuolumne County, supra,* 155 Cal.App.4th at pp. 1227–1228 [home improvement center EIR must include road realignment called for in general plan for 20 years]; *id.* at p. 1230 [criticizing *West Side Irrigation*; "the possibility that two acts could be taken independently of each other is not as important as whether they actually will be implemented independently of each other"].)

9 Cal.4th 559, 576, fn. 6 [38 Cal.Rptr.2d 139, 888 P.2d 1268] [highway EIR could omit detailed analysis of "anticipated," but "still contingent," expansion].)

And the NBR project "will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights, supra,* 47 Cal.3d at p. 396.) The park project involves widening West Coast Highway, installing a traffic signal on West Coast Highway, and constructing a 1,400-foot, two-lane access road for daily use by 173 vehicles. The NBR project will change the scope and nature of the road. It doubles the road's width from two lanes to four lanes, extends the first 850 feet of the road to 19th Street, and contemplates daily use by thousands of cars.[6]

What remains is that key word: consequence. While the NBR project may make reasonably foreseeable changes to the scope and nature of the park project (at least to its access road), we must determine whether "it is a reasonably foreseeable consequence of the initial project." (*Laurel Heights, supra,* 47 Cal.3d at p. 396, italics added.) Where does the park project fit in among our categories of cases?

To some extent, this case fits in the "first step" category. When the City issued the park notice of preparation, it knew the NBR project was coming— the City had already issued the NBR notice of preparation. Both projects need an access road. Building the park's access road obligates the City to do some work that benefits the NBR project. That includes widening West Coast Highway, installing a traffic signal at West Coast Highway to accommodate thousands of vehicles daily, and constructing a section of "[NBR LLC's] road . . . at their grades," subject to NBR LLC's approval. All this is reasonably seen as easing the way for the NBR project.

But the park's access road is only a baby step toward the NBR project.[7] Certainly it is a much smaller step than the reviewed actions in the "first

---

[6] We grant the City's request to take judicial notice of a staff report, hearing transcript, draft minutes, and notice of determination from the California Coastal Commission. Apparently, the commission approved the City's application for a coastal development permit for the park— but in its application, the City abandoned the access road in favor of using an existing parking lot across Superior Road. Even so, this appeal is not moot. First, the commission has not yet issued its final permit, findings, and conditions. Second, the City has not rescinded its approval of the park EIR. (Cf. *Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2011) 198 Cal.App.4th 939, 941 [130 Cal.Rptr.3d 520] [appeal moot where developer abandoned project and "City rescinded the resolutions approving the project"].) Finally, this appeal challenges the park EIR in ways unrelated to the access road, as discussed below.

[7] Imprecision in distilling the piecemealing doctrine is contemplated, if not mandated, by *Laurel Heights*'s expressly fact-dependent test. (*Laurel Heights, supra,* 47 Cal.3d at p. 396.) Some tipping point exists at which the park project would do so much of the work needed by the NBR project that the two projects would become one. Their implementation would be

step" cases. The park project does not take the major step of changing Banning Ranch's zoning to accommodate the NBR project. (Cf. *Bozung, supra*, 13 Cal.3d at pp. 269–270 [annexing land for rezoning and development]; *City of Carmel-by-the-Sea v. Board of Supervisors, supra*, 183 Cal.App.3d at p. 244 [rezoning land for "specific development project"].) Nor is the park being built to induce Banning Ranch's development—the NBR project has already been planned. (Cf. *Antioch, supra*, 187 Cal.App.3d at p. 1337 [road and sewer was "catalyst" for future development].) The access road furthers the NBR project, but relatively modestly. (Cf. *Laurel Heights, supra*, 47 Cal.3d at p. 398 [initial relocation into one-third of building].) Expanding the park access road into Bluff Road will still require an enormous undertaking, doubling the number of lanes and extending it thousands of feet to 19th Street. And the NBR project is much more than just Bluff Road; that road will service 1,375 new residential units, 75,000 new square feet of commercial space, and a new resort hotel. The access road is consistent with the NBR project, no doubt. But it is a stretch to say the NBR project is a consequence of the access road.

The park project fits more closely into the "no piecemealing" category. The park project and the NBR project have "different project proponents." (*CBE, supra*, 184 Cal.App.4th at p. 99.) They serve different purposes; one provides recreational opportunities for existing residents, the other develops a new neighborhood. (*Ibid.* ["independently justified separate projects"]; see *Castaic Lake, supra*, 180 Cal.App.4th at p. 237 [reviewed project had "significant independent or local utility"].) And the City can and will build the park regardless of any development on Banning Ranch. (See *Castaic Lake, supra*, 180 Cal.App.4th at p. 237 [reviewed project intended regardless of whether other project completed]; *West Side Irrigation, supra*, 128 Cal.App.4th at p. 699 [projects "could be implemented independently of each other"].)

Finally, and importantly, the City's general plan calls for construction of Bluff Road or its equivalent. (See *Plan for Arcadia, supra*, 42 Cal.App.3d at p. 724; but see *Tuolumne County, supra*, 155 Cal.App.4th at p. 1228.) The City intends to build a north and south road from West Coast Highway to 19th Street whether it acquires Banning Ranch to preserve it as open space or annexes Banning Ranch as part of the NBR project.

Plaintiff contends no roads will be built across Banning Ranch if it is acquired for open space, but we disagree.[8] The general plan has only one

---

sufficiently interdependent in practice, even if theoretically separable, and a piecemealing challenge would be well founded. (Cf. *Tuolumne County, supra*, 155 Cal.App.4th at p. 1230.) All we need to decide is that the baby steps taken here fall short of that point.

[8] We reach the same result whether we defer to the City's interpretation of its own general plan or review it independently.

master plan of streets and highways. And it shows two intersecting roads over Banning Ranch that take the same basic path as the NBR project's Bluff Road (except one continues through the parcel to be used for the park). Plaintiff correctly notes the general plan's EIR responded to one comment by stating, "If an open space option is ultimately selected and implemented, no roadways would be anticipated upon Banning Ranch." But that response also referred to a transportation study, which provides the roadways must be built even without development. One of the referenced pages of the study states, "If the open space preservation occurs, roadway segments through the property (Bluff Road and 15th Street) will not be constructed, the relief to Superior Avenue at Coast Highway will not be provided by the new connections, and Superior Avenue at Coast Highway will experience Level of Service [(LOS)] 'E' conditions. If the Banning Ranch property is acquired for open space, Superior Avenue at Coast Highway is expected to operate at LOS 'E' in both the AM and PM peak hours without improvements." The study continues, "Previous analysis has indicated that necessary improvements to achieve acceptable LOS . . . exceed the existing/planned roadway cross-section substantially. Therefore, a roadway crossing the Banning Ranch open space would still be required." All that means is this: if no developer builds roads across Banning Ranch, then unacceptable traffic conditions will occur at Superior Avenue and West Coast Highway ("The current standard for acceptable level of service in the City of Newport Beach is 'D' "), and so the roads would need to be built anyway. If Bluff Road will be built in any event, the NBR project is not a consequence of the park project just because the park access road will accommodate expansion into Bluff Road.

■ We conclude the EIR adequately defines the project, without inclusion of the NBR project. The park project and the NBR project are separate actions. The City is not giving them improper piecemeal review.

*The EIR Adequately Addressed the Park Project's Environmental Impacts*

Even if the EIR properly defined the park project, plaintiff contends the EIR inadequately analyzed five points: (1) the cumulative traffic impact, (2) the growth-inducing impact, (3) the cumulative biological impact, (4) the impact on habitat for the California gnatcatcher, and (5) its consistency with the Coastal Act. We disagree.

1. *Cumulative Traffic Impact.* Plaintiff contends the park EIR insufficiently addresses the cumulative impact that the park project and NBR project might have on traffic. It notes the draft EIR's traffic analysis lists the NBR project as one of the "**Cumulative Projects**," the "reasonably foreseeable projects in

the [park] Project vicinity . . . that are in various stages of the application and approval process, but have not yet been approved." But the actual cumulative impact analysis fails to account for any traffic from the NBR development.

██ "Cumulative impacts analysis evaluates the incremental impact of the project in conjunction with, or collectively with, other closely related past, present, and reasonably foreseeable probable future projects." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 912 [98 Cal.Rptr.3d 137] (*Long Beach*).) " ' "Cumulative impact analysis 'assesses cumulative damage as a whole greater than the sum of its parts.' " ' " (*Id.* at p. 905.) " '[T]he discussion of cumulative impacts should be guided by the standards of practicality and reasonableness.' " (*Id.* at p. 912.)

" 'We review an agency's decision regarding the inclusion of information in the cumulative impacts analysis under an abuse of discretion standard. "The primary determination is whether it was reasonable and practical to include the projects and whether, without their inclusion, the severity and significance of the cumulative impacts were reflected adequately." ' " (*Long Beach, supra,* 176 Cal.App.4th at p. 906.) " ' "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." ' " (*Id.* at p. 898.) " "Therefore, "[n]oncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown." [Citations.]' [Citation.] [¶] 'Failure to comply with the information disclosure requirements constitutes a prejudicial abuse of discretion when the omission of relevant information has precluded informed decisionmaking and informed public participation . . . .' " (*Ibid.*)

The traffic cumulative impact analysis was reasonable and practical, at least as set forth in the final EIR. In a two-part response to public comment P54 on the draft EIR, the City stated the park access road was consistent with the general plan.[9] The general plan, as already noted, calls for the construction of Bluff Road (or its equivalent).[10] And the general plan's EIR "assumed worst case conditions, including alternate residential and commercial development on the Banning Ranch property," and analyzed the traffic impact from

---

[9] Because plaintiff did not submit this comment, the City claims plaintiff failed to exhaust its administrative remedies. But plaintiff "may assert any issues raised by other parties during the administrative proceedings." (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1119 [71 Cal.Rptr.2d 1].)

[10] The general plan anticipates development on Banning Ranch substantially similar to that proposed in the NBR project: a total of 1,375 residential dwelling units. Plaintiff quibbles about differences in the exact number of specific types of dwelling units, but it fails to show those changes render the traffic analysis inadequate.

the proposed Bluff Road and its intersection with West Coast Highway. (See *Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 307 [223 Cal.Rptr. 18] [EIR met cumulative impact requirement by referencing general plan that "necessarily addressed the cumulative impacts of buildout to the maximum possible densities allowed by those plans"].) Additionally, the park EIR's traffic signal analysis does address the cumulative impact of the park access road and Bluff Road to some extent. To be sure, the cumulative impact analysis in the park EIR could have been set forth more directly. But an EIR need not achieve " ' "perfection." ' " (*Long Beach, supra*, 176 Cal.App.4th at p. 898.) The City's effort here was adequate.

2. *Growth-Inducing Impacts.* Plaintiff contends the EIR "astonishingly concludes that the [park] Project will have no growth-inducing impacts," "[d]espite the obvious connections between the Sunset Ridge [Park] infrastructure and the proposed NBR project."

The EIR evaluated "[t]he potential growth-inducing effects of the Project . . . in three ways: [¶] 1. Would the Project have an effect on undeveloped land that may not be designated on any general plan for urban development, but would nonetheless experience increased growth pressure due to the presence of the Project? [¶] 2. Would the Project have an effect by removing constraints, thereby facilitating the construction of previously approved projects? [¶] 3. Would the Project influence redevelopment of areas at a higher intensity than currently exists?" It concluded the park "would serve an identified need" by filling a "citywide park deficiency," "rather than induce population growth and/or new development in the City . . . ." It noted the park was "compatible with adjacent land uses"; "consistent [with] the City's General Plan, Coastal Land Use Plan, and Zoning designations for the site"; and would not "induce substantial new unforeseeable development in the area."

■ "Under CEQA, a public agency is not always 'required to make a *detailed* analysis of the impacts of a project on [future] housing and growth.' [Citation.] 'Nothing in the [CEQA] Guidelines, or in the cases, requires more than a general analysis of projected growth. The detail required in any particular case necessarily depends on a multitude of factors, including, but not limited to, the nature of the project, the directness or indirectness of the contemplated impact and the ability to forecast the actual effects the project will have on the physical environment.' [Citation.] [¶] 'In addition, it is relevant, although by no means determinative, that future effects will themselves require analysis under CEQA.' " (*Muzzy Ranch Co. v. Solano County*

*Airport Land Use Com.* (2007) 41 Cal.4th 372, 388 [60 Cal.Rptr.3d 247, 160 P.3d 116]; accord, *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 227 [128 Cal.Rptr.3d 733] *(Clover).*)

"The substantial evidence standard . . . applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions. [Citation.] 'Substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." ' " *(Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203].) "In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' " *(Vineyard, supra,* 40 Cal.4th at p. 435.)

Here, substantial evidence supports the EIR's conclusion that the park will not have a growth-inducing impact, particularly in regard to the NBR project. Most notably, the NBR project was proposed first—the park is not inducing it. As our piecemealing analysis showed, the NBR project is not a consequence of the park. (See *Clover, supra,* 197 Cal.App.4th at p. 227 [no growth-inducing impact because purpose of sewer construction was "first to meet the needs of the current project. And the nature of the project is not to facilitate additional development"]; cf. *Antioch, supra,* 187 Cal.App.3d at p. 1337 [growth-inducing impact because "the sole reason to construct the road and sewer project is to provide a catalyst for further development in the immediate area"]; *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 158 [39 Cal.Rptr.2d 54] ["proposed country club may induce housing development in the surrounding area," which was undeveloped].) The park has the independent purpose of providing recreational facilities that, as the EIR noted, are badly needed to serve the City's existing residents.

Other considerations support the EIR's growth-inducing impact analysis. First, the EIR noted the park's access road is consistent with the general plan. (See *Clover, supra,* 197 Cal.App.4th at p. 228 ["growth has already been analyzed in the City's general plan EIR," which the project EIR incorporated "when it referenced the reader" to it]; *Friends of the Eel River v. Sonoma*

*County Water Agency* (2003) 108 Cal.App.4th 859, 877 [134 Cal.Rptr.2d 322] [acceptable for agency, "[i]n considering the growth inducing impacts of the Project [to] incorporate[] the discussion contained in . . . general plan EIR's"].) Second, any impact on growth is "indirect" because the access road "removes only one of potentially numerous obstacles and approval requirements for developing" the NBR project. (*Clover*, at p. 228.) Finally, the NBR project is undergoing its own environmental review. (*Id.* at p. 227 ["it is relevant . . . that future effects will themselves require analysis under CEQA"].)

3. *Cumulative Biological Impacts.* Plaintiff notes the draft EIR's biological resources analysis does not mention the NBR project at all in its "**CUMULATIVE IMPACTS**" discussion.

Even so, the biological resources cumulative impact analysis in the final EIR was reasonable and practical. The City responded to public comment 40 by stating, "The Newport Banning Ranch property is assumed in the cumulative biological resources analysis; both properties are within the boundaries of the NCCP." That is a reference to the "Natural Communities Conservation Plan" habitat conservation plan for the Central/Coastal subregion which, as explained in the draft EIR, plays an "important role in mitigating cumulative impacts through the preservation and management of open space or a region-wide and ecosystem based program." The draft EIR continues, "Conservation biologists and regional planners have determined that ecosystem based programs, such as the NCCP, are the most appropriate way to evaluate and mitigate for potential cumulative impacts resulting from multiple projects impacting biological resources in a given region."

The City thus clarified that the draft EIR did account for the NBR project in its biological resource cumulative effects analysis. And that analysis concluded, "When viewed collectively, these projects would not result in cumulative impacts to biological resources because (1) none of the projects are located in the Central/Coastal Subregion Reserve System, (2) three of the projects are participants in the Central/Coastal Subregion NCCP/HCP, with the allotted take authority, (3) significant native habitat has already been conserved in Orange County, (4) each project has mitigated its potential impacts to biological resources consistent with State and federal law, (5) the quantity of native habitat on the Project site that would be impacted is not cumulatively significant." With the clarification, the EIR sufficiently satisfied its dual roles as " 'an informational document' " (*Laurel Heights, supra,* 47 Cal.3d at p. 391) and "a document of accountability" (*id.* at p. 392).

4. *California Gnatcatcher Habitat Impact.* Plaintiff contends the EIR downplayed the park project's significant impact on the habitat of a threatened bird, the California gnatcatcher. Plaintiff further contends the EIR failed

to adequately mitigate this significant impact. (See *Laurel Heights, supra,* 47 Cal.3d at p. 391 [agency must "find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits"].)

The EIR analyzed the park project's impact on the California gnatcatcher's habitat. It noted, "The Project site is within Critical Habitat units defined by the U.S. Fish and Wildlife Service (USFWS) for the coastal California gnatcatcher. The western portion of the site also supports the federally listed Threatened coastal California gnatcatcher." The draft EIR acknowledged, "The Project is expected to impact a total of 0.68 acre (0.14 acre southern coastal bluff scrub, 0.48 acre disturbed mule fat scrub/goldenbush scrub, and 0.06 acre willow scrub) of habitat for this species. The Encelia scrub, Encelia scrub/ornamental, and disturbed Encelia scrub on the Project site would not be considered utilized by the gnatcatcher due to the periodic mowing and traffic/pedestrian edge effects in this area." (Fns. omitted.)[11]

The EIR concluded, "[t]he impact on this species would be considered significant," but "[i]mplementation of [mitigation measures] would reduce this impact to a less than significant level." Among a host of mitigation measures—e.g., no scrub removal during breeding and nesting season, flushing gnatcatchers before scrub removal or earth moving—the City would mitigate "the loss of 0.41 acre of coastal sage scrub habitat . . . at a two to one (2:1) ratio on the Project site or in suitable off-site locations in the Newport Beach/Costa Mesa area. A 2:1 ratio for mitigation is appropriate for the habitat impacted which is non-typical for gnatcatchers and subject to degradation by invasive, non-native species."

 Substantial evidence supports the EIR's determination that the park project would significantly impact only 0.68 acre of California gnatcatcher habitat. (See *Vineyard, supra,* 40 Cal.4th at p. 435 [standard of review].) Plaintiff contends the entire 18.9 acre project site is "*per se* significant" because it was all designated a "critical habitat" by the United States Fish and Wildlife Service (USFWS), including four acres of scrub habitat containing "primary constituent elements" (PCEs) essential to the conservation of the species. But plaintiff cites no cases deeming every square foot within these USFWS designations to be equally significant, or significant at all. The one case they do offer parenthetically noted only that a "potential substantial impact on endangered, rare or threatened species is per se significant." (*Vineyard, supra,* 40 Cal.4th at p. 449.) That leaves the question of whether a potential impact is "substantial"—and that is a question of fact. (*Ibid.* [reviewing for substantial evidence].)

---

[11] The final EIR clarified the 0.68 acre is habitat "determined to be used by this species during the breeding season."

■ Here, the observations and opinions of the City's biologist sufficiently support the determination that all but 0.68 acre of the habitat was so degraded its loss would not be substantial. Plaintiff contends the purportedly "degraded" scrub still supports a pair of gnatcatchers, but the EIR already notes the birds' presence. Plaintiff also contends the scrub was degraded only due to illegal mowing that could be stopped. But "environmental impacts should be examined in light of the environment as it exists when a project is approved," and any illegal activities affecting the baseline environmental condition are best addressed by enforcement agencies. (*Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1453 [91 Cal.Rptr.2d 322].)

■ Similarly, substantial evidence shows the mitigation measures were adequate. (See *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 495 [14 Cal.Rptr.3d 308] [mitigation may include "minimizing impacts by limiting the degree or magnitude of the action" and "compensating for the impact by replacing or providing substitute resources or environments"].) Plaintiff disputes that mitigating 0.41 acres of scrub at a two-to-one ratio is sufficient, and questions whether all of the mitigated scrub is truly gnatcatcher habitat. But this is the type of second-guessing that we will not do on appeal. (*Vineyard, supra,* 40 Cal.4th at p. 435 ["the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable' "; court cannot " 'determine who has the better argument' "].) In any event, mitigation need not account for every square foot of impacted habitat to be adequate. What matters is that the unmitigated impact is no longer significant. (*Mira Mar Mobile Community*, at p. 495 [mitigation at three-to-one ratio adequate even though "the project will result in a net loss of .23 acres of coastal sage scrub"].) Nor must the City acquiesce to different mitigation measures proposed by the United States Army Corps of Engineers or anyone else. (*Ibid.*) And the fact that mitigation will be implemented over time does not mean the City has improperly deferred mitigation.

5. *Coastal Act Consistency*. Plaintiff contends the EIR failed to disclose the park project's inconsistency with the Coastal Act. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 543 [78 Cal.Rptr.3d 1] (*Sierra Club*) [an " 'EIR shall discuss any inconsistencies between the proposed project and applicable general plans and regional plans' "].) It contends the EIR wrongly concluded the park project was consistent with the Coastal Act's protection of "environmentally sensitive habitat areas" (ESHAs) and wetlands.

The ESHA analysis was adequate. The EIR identified the relevant Coastal Act policies. It stated no area of project had been designated an ESHA, according to the City's coastal land use plan. It acknowledged two areas had "the potential to be considered . . . ESHA[s] by the California Coastal

Commission." These were the "disturbed mule fat scrub/goldenbush scrub that is occupied by the [California gnatcatcher]" and some "willow scrub habitat." But it reported the "[i]mpacts to willow scrub habitat and disturbed mule fat scrub/goldenbush scrub would be mitigated to a less than significant level" "through habitat restoration on site and/or in the immediate vicinity of the Project site . . . ." The EIR concluded the park project was "consistent" with the policy of "protect[ing] ESHAs against any significant disruption of habitat values."

Plaintiff claims the Coastal Commission is "highly likely" to designate the two areas as ESHAs, and will reject the attempted mitigation. Maybe it will.[12] That remains to be seen. All the EIR needed to do at this stage is " 'discuss any inconsistencies' " with the Coastal Act. (*Sierra Club, supra*, 163 Cal.App.4th at p. 543.) There are no inconsistencies at the moment; the EIR adequately flagged potential inconsistencies and addressed them in advance through proposed mitigation.

The wetlands analysis was also adequate. The EIR stated, "no wetlands defined by the California Coastal Act occur on the Project site." Plaintiff contends the EIR wrongly used only the federal wetlands methodology, not the proper state methodology. But the EIR's biological technical report sets forth the Coastal Act's definition of wetlands, and later concludes that "[b]ased on the project design plans, no wetlands as defined by the Coastal Act are expected to be impacted by the project." Nothing reasonably suggests the EIR failed to apply the wetlands definition it just recited. Plaintiff also reargues the evidence, asserting a series of past actions on the site (illegal mowing, prior vegetation removal by NBR LLC) might require future remediation, and noting a City planner's ambiguous statement that "[t]here is enough there for coastal staff to determine it a wetland . . . ."[13] But the question is whether substantial evidence supports the City's approval of the EIR, not whether " 'an opposite conclusion would have been equally or more reasonable.' " (*Vineyard, supra*, 40 Cal.4th at p. 435.) We cannot " 'weigh conflicting evidence and determine who has the better argument.' " (*Ibid.*) The biological technical report sufficiently supports the EIR.

---

[12] (See *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 507 [83 Cal.Rptr.2d 850] [loss of ESHA's habitat value cannot be mitigated by recreating it elsewhere].)

[13] The statement is less ambiguous in context. A City planner wrote to a City engineer: "After ta[l]king it over with Gary, I think coastal staff won't call it a wetland given the characteristics of that area, but you never know. There is enough there for coastal staff to determine it a wetland and they likely will try if they previously called a very similar area a wetland. Our record won't call it a wetland and if they push it, it will be that prior precedent or politics driving them and I will be there to attempt to push those ideas back into the sea!"

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.

Aronson, Acting P. J., and Thompson, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 27, 2013, S208112.