Filed 5/20/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BANNING RANCH CONSERVANCY, | |
| Plaintiff and Appellant, | G049691 |
| v. | (Super. Ct. No. 30-2012-00593557) |
| CITY OF NEWPORT BEACH et al., | O P I N I O N |
| Defendants and Appellants; | |
| NEWPORT BANNING RANCH LLC et al., | |
| Real Parties in Interest and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Robert Louis Becking, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Reversed.

Office of the City Attorney for the City of Newport Beach, Aaron Harp, City Attorney and Leonie Mulvihill, Assistant City Attorney; Remy Moose Manley, Whitman F. Manley and Jennifer S. Holman for Defendants and Appellants.

Leibold McClendon & Mann and John G. McClendon for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Susan K. Hori and Benjamin G. Shatz for Real Parties in Interest and Appellants.

Kamala D. Harris, Attorney General, John A. Saurenman, Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, for California Coastal Commission as Amicus Curiae.

Banning Ranch consists of approximately 400 acres of largely undeveloped coastal property, with active oilfield facilities and operations dispersed thereon. Project proponents[1] seek to develop one-fourth of Banning Ranch for residential and commercial purposes, and to preserve the remaining acreage as open space and parks, removing and remediating much of the oil production equipment and facilities (the Project). The City of Newport Beach and its City Council (collectively the City) approved the Project. Banning Ranch Conservancy (the Conservancy), "a community-based organization dedicated to the preservation, acquisition, conservation and management of the entire Banning Ranch as a permanent public open space, park, and coastal nature preserve," filed a mandamus action against the City.

The trial court agreed with the Conservancy's claim that the City violated the Planning and Zoning Law (Gov. Code, § 65000 et seq.) and its own general plan by its alleged failure to adequately coordinate with the California Coastal Commission before its approval of the Project. On the other hand, the court rejected the Conservancy's claim that the City violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) by failing to identify in the environmental impact report (EIR) the "environmentally sensitive habitat areas"

---

[1] Project proponents are real parties in interest Newport Banning Ranch LLC, Aera Energy LLC, and Cherokee Newport Beach, LLC.

(ESHAs) — a defined term in the California Coastal Act of 1976 (Coastal Act; Pub. Resources Code, § 30000 et seq.). All interested parties appealed. We agree with the court's CEQA ruling but conclude the court erred by finding the City violated its general plan. We therefore reverse the judgment to the extent it provides for mandamus relief to the Conservancy.

FACTS[2]

We describe in this section: (1) the City's general plan, as it pertained to Banning Ranch; (2) the City's coastal land use plan, which, by its own terms, did not apply to Banning Ranch; (3) the proposed Project; (4) the draft EIR; (5) The City's response to comments and final EIR; (6) the City's approval of the Project; and (7) the procedural history of this action. Keep in mind the primary legal disputes: (a) What actions were required of the City vis-à-vis the Coastal Commission, prior to Project approval, regarding the decision whether to develop, preserve, or restore particular portions of Banning Ranch; and (b) Was the City required to designate ESHAs in the EIR?

*The City's General Plan, as it Pertains to Banning Ranch*

"Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, long-term general plan for the physical

---

[2] Collectively, the parties' thorough, well-researched "briefs" exceed 300 pages. The City's appendix features 1,489 pages and the Conservancy's appendix adds 98 pages. The electronic administrative record totals a whopping 49,046 pages. We have striven to limit our recitation of facts to those strictly necessary to the analysis of the issues before us and to refrain from discussing unnecessary background material and the parties' arguments in the alternative. We assure the parties, however, that we appreciate their diligence in bringing all potentially relevant materials and issues to our attention.

3

development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300.) The general plan adopted by a legislative body is "a '"constitution" for future development' [citation] located at the top of 'the hierarchy of local government law regulating land use' [citation]." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773.) "The planning law . . . compels cities and counties to undergo the discipline of drafting a master plan to guide future local land use decisions." (*Ibid*.)

The City's 2006 general plan recognizes Banning Ranch as a distinct "[d]istrict" within its "sphere of influence."[3] The general plan acknowledges both the damage done by longstanding ("at least 75 years") use of Banning Ranch for oil extraction activities and the value of Banning Ranch as a wildlife habitat and open space resource for citizens. The environmental value of the "diverse habitats" contained within Banning Ranch varies. Some of Banning Ranch (particularly the northwestern portion) has a "high biological resource value"; other segments are of lesser environmental importance.

The general plan notes resident support for the preservation of all of Banning Ranch as open space or, alternatively, the limited development of Banning Ranch if necessary "to help fund preservation of the majority of the property as open space." A highlighted "Policy Overview" section states as follows: "The General Plan prioritizes the acquisition of Banning Ranch as an open space amenity for the community and region. Oil operations would be consolidated, wetlands restored, nature education and interpretive facilities provided, and an active park developed containing playfields and other facilities to serve residents of adjoining neighborhoods. [¶] Should the

---

[3] The vast majority of Banning Ranch (361 acres) is within the jurisdiction of unincorporated Orange County; the remaining 40 acres are within the City. Nonetheless, all of Banning Ranch falls within the City's "'sphere of influence'" and is therefore the appropriate subject of the City's general plan. (See *Merritt v. City of Pleasanton* (2001) 89 Cal.App.4th 1032, 1034; Gov. Code, §§ 65300, 65859, subd. (a).)

4

property not be fully acquired as open space, the Plan provides for the development of a concentrated mixed-use residential village that retains the majority of the property as open space. . . . While the Plan indicates the maximum intensity of development that would be allowed on the property, this will ultimately be determined through permitting processes that are required to satisfy state and federal environmental regulatory requirements."

Building on its stated policy preferences, the general plan identifies two alternative land use "Goal[s]."[4] The first goal, "LU 6.3," is "[p]referably a protected open space amenity, with restored wetlands and habitat areas, as well as active community parklands to serve adjoining neighborhoods." The second goal, "LU 6.4," is a backup option: "If acquisition for open space is not successful, a high-quality residential community with supporting uses that provides revenue to restore and protect wetlands and important habitats."

Each alternative goal features a "Policies"[5] section beneath the goal. The policies in support of Goal LU 6.3 are simple. The first, described as a "LAND USES" policy and entitled "Primary Use," declares the intended use of Banning Ranch to be open space. A "STRATEGY" listed underneath is entitled "Acquisition for Open Space" and announces support for the acquisition of Banning Ranch by the City through a variety of possible funding mechanisms. Both the land uses and strategy sections cross-reference several implementation actions,[6] described elsewhere in the general plan.

---

[4] According to the general plan, "Goals describe ideal future conditions for a particular topic, such as for Banning Ranch . . . . Goals tend to be very general and broad."

[5] According to the general plan, "Policies provide guidance to assist the City as it makes decisions relating to each goal. Some policies include guidelines or standards against which decisions can be evaluated."

[6] According to the general plan, "Implementation Actions identify the

5

The Policies listed beneath Goal LU 6.4 are more detailed. The "LAND USES" section entitled, "Alternative Use," describes the limited development of a residential village, "with a majority of the property preserved as open space." Next follows nine separate policies setting forth requirements pertaining to development density, capacity, design, and methods.[7] A "STRATEGY" also requires "the preparation of a master development or specific plan for any development on the Banning Ranch specifying lands to be developed, preserved, and restored, land uses to be permitted, parcelization, roadway and infrastructure improvements, landscape and streetscape improvements, development regulations, architectural design and landscape guidelines, exterior lighting guidelines, processes for oil operations consolidation, habitat preservation and restoration plan, sustainability practices plan, financial implementation, and other appropriate elements." Various implementation actions were also referenced throughout this section.[8]

The general plan then announces "Policies Pertaining to Both Land Use Options (Goals 6.3 and 6.4)." The first three policies pertain to "PERMITTED USES" and discuss oil operations, an active community park, and the restoration of wetlands and

specific steps to be taken by the City to implement the policies. They may include revisions of current codes and ordinances, plans and capital improvements, programs, financing, and other measures that should be assigned to different City departments."

[7] Specific limits on development include a maximum of 1,375 residential units, a maximum of 75,000 square feet of retail commercial uses, and a maximum of 75 rooms in a facility offering overnight accommodations.

[8] In addition, section 10.9 of the natural resources element of the general plan (entitled "Development on Banning Ranch"), provides: "Protect the sensitive and rare resources that occur on Banning Ranch. If future development is permitted, require that an assessment be prepared by a qualified biologist that delineates sensitive and rare habitat and wildlife corridors. Require that development be concentrated to protect biological resources and coastal bluffs, and structures designed to not be intrusive on the surrounding landscape. Require the restoration or mitigation of any sensitive or rare habitat areas that are affected by future development."

wildlife habitat. The fourth and fifth policies pertain to "DESIGN AND DEVELOPMENT" in connection with the preservation of environmental resources and the public's views.

The focus of this appeal as it relates to the general plan is the final section of the land use discussion of Banning Ranch, listed under the "Policies Pertaining to Both Land Use Options," but designated specifically as a "STRATEGY," a term not defined in the general plan. We quote this section in its entirety. "LU 6.5.6 [¶] Work with appropriate state and federal agencies to identify wetlands and habitats to be preserved and/or restored and those on which development will be permitted." The citations at the end of the quote refer to Implementation Actions 14.7 and 14.11, which are listed elsewhere in the general plan. Implementation Action 14.7 is entitled "Coordinate with the California Resources Agency, Department of Fish and Game," and describes various issues on which the City should either "consult[]," "support," or "cooperate with" this agency. Implementation Action 14.11 is entitled, "California Public Utilities Commission" (PUC) and states that the City "shall work with the PUC in obtaining funding and implementing the undergrounding of remaining overhead utilities."

Implementation Action 14.6 is conspicuous by its absence from LU 6.5.6 and the rest of the section of the general plan pertaining specifically to Banning Ranch. Implementation Action 14.6 is entitled "Coordinate with California Coastal Commission." Its text reads: "The California Coastal Commission is responsible for the implementation of the *California Coastal Act of 1976*. As described [elsewhere in the general plan], the City's Local Coastal Program's (LCP) Land Use Plan (CLUP) had been certified at the time of the adoption of the updated General Plan. The City shall work with the Coastal Commission to amend the CLUP to be consistent with the General Plan and pursue certification of the Implementation Plan. The City shall ensure that on certification, applications for development shall be reviewed by the City for consistency with the certified LCP and *California Coastal Act of 1976*."

*The City's Coastal Land Use Plan, Which Specifically Excludes Banning Ranch*

Pursuant to the Coastal Act, the Coastal "Commission is required to protect the coastal zone's delicately balanced ecosystem." (*Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 506 (*Bolsa Chica*).)  Banning Ranch is within the "'[c]oastal zone'" (Pub. Resources Code, § 30103) and is therefore subject to the Coastal Commission's jurisdiction.

Among other things, the Coastal Act "provides heightened protection to" ESHAs within the coastal zone. (*Bolsa Chica*, *supra*, 71 Cal.App.4th at p. 506.) "'Environmentally sensitive area' means any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." (Pub. Resources Code, § 30107.5.)  "Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas." (Pub. Resources Code, § 30240, subd. (a).)  "Development in areas adjacent to environmentally sensitive habitat areas . . . shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat . . . areas." (Pub. Resources Code, § 30240, subd. (b).)

"A combination of local land use planning procedures and enforcement to achieve maximum responsiveness to local conditions, accountability, and public accessibility, as well as continued state coastal planning and management through a state coastal commission are relied upon to insure conformity with the provisions of the act [citation].  Therefore, all local governments lying in whole or in part within the coastal zone had to prepare and submit to the Commission a local coastal plan (LCP) [citation].  The LCP consists of a local government's '(a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions, . . . .' [Citation.]  The precise content of each LCP is determined

8

by the local government in full consultation with the Commission [citation] and must meet the requirements of, and implement the provisions and policies of [the act] at the local level [citation]." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 566.)

In 2005, the City obtained Coastal Commission approval of its coastal land use plan (Pub. Resources Code, § 30108.5) — a key facet of its local coastal program (Pub. Resources Code, § 30108.6). The City has not submitted an implementation plan to the Coastal Commission, however, so it was not able to issue coastal development permits on its own. Hence, all new applications for coastal development permits must be processed by the Coastal Commission.

Despite its inability to issue coastal development permits, "[t]he City reviews pending development projects for consistency with the General Plan, Zoning regulations, and the [coastal land use plan], before an applicant may file for a [coastal development permit] with the Coastal Commission." And the City's coastal land use plan, Policies 4.1.1-1, states: "Define any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments as an [ESHA]." The City's coastal land use plan sets forth criteria for determining if a habitat is an ESHA, and includes a presumption that habitat meeting the prescribed criteria is ESHA, subject to rebuttal by "*site-specific evidence*."

Banning Ranch, however, is specifically excluded from the scope of the CLUP. "A Deferred Certification Area . . . refers to an area where both the land use plan and implementing actions plan have been deferred to some future date in order to avoid delay in certifying the balance of the [coastal land use plan]. The Coastal Commission retains permit jurisdiction in all deferred certification areas. [¶] Newport Banning Ranch is a [Deferred Certification Area]." The City's coastal land use plan policies "[d]esignate the Banning Ranch property as an area of deferred certification until such time as the future land uses for the property are resolved and policies are adopted to address the

9

future of the oil and gas operations and the protection of the coastal resources on the property."

In sum, the City would ordinarily be obligated under its coastal land use plan to identify ESHAs in its review of a coastal project. But the City's coastal land use plan explicitly excludes Banning Ranch from its scope.

*The City Does Not Acquire Banning Ranch; Instead, Development is Proposed*

As one can well imagine, 400 acres of coastal property in Orange County does not come cheap. A pricing study commissioned by the City indicated it could take between $184 million to $211 million to acquire Banning Ranch, although the amount might be reduced to a range of $138 million to $158 million if the entire property were purchased in a single transaction. These purchase prices would not include the cost of oil field clean up and remediation. After efforts to obtain funding from a variety of sources foundered, the City ultimately concluded that acquisition of Banning Ranch for preservation as open space in its entirety (i.e., the preferred outcome specified in the general plan) was infeasible.

Parallel with the City's exploration of the possibility of acquiring Banning Ranch, a development proposal was formally submitted to the City in August 2008.[9] The proposal precisely tracks upper limits for development set forth in the general plan (e.g., number of residential units, amount of commercial space) and indicates that the majority of Banning Ranch will be preserved as open space. The proposal includes a planned community development document, designed to address the City's strategy to develop a master plan for Banning Ranch's development.

---

[9] The general plan endorses the dual-track pursuit of development "entitlement[s] and permits for a residential village during the time allowed for acquisition as open space."

10

The proposal "documented and mapped the extensive field survey work that the environmental team has done on potential special status habitats (potential ESHA), as demonstrated in the Biological Technical Report."  The referenced biological technical report, prepared by Glenn Lukos Associates, Inc., identifies "potential ESHA in accordance with the City's Coastal Land Use Policies."[10]  A map of Banning Ranch identifying potential ESHA and non-ESHA areas was also included with the report.

*Draft Environmental Impact Report*

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment."  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*).)  "The Legislature has made clear that an EIR is an 'informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of a project might be minimized; and to indicate alternatives to such a project.'"  (*Id.* at p. 391.)  "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.]  The EIR is therefore 'the heart of CEQA.'"  (*Id.* at p. 392.)

_____

[10]     This 2008 "draft" biological technical report was not included in the administrative record prepared by the City.  The court granted the City's motion to strike the document from the record, finding fault with the Conservancy's tardy attempt to lodge this document rather than filing a timely motion to augment the administrative record.  We sidestep the issue of whether the court's ruling was proper by considering this document to be part of the record.  In our view, the inclusion of this document in the record makes no difference to the outcome of this appeal.  Moreover, by considering the excluded document, we avoid the appearance that the City gained an advantage in this case by excluding (whether intentionally or unintentionally) a document from the administrative record.

11

"Under CEQA, the public is notified that a draft EIR is being prepared [citations], and the draft EIR is evaluated in light of comments received. [Citations.] The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. [Citations.] The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project. [Citation.] Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 391, fn. omitted.)

A notice of preparation of an EIR concerning the Project was distributed in March 2009 to affected individuals and agencies, including the Coastal Commission. After years of study and preparation, a 1,400-page draft EIR, with 5,560 additional pages in the appendices, was completed in September 2011.

The draft EIR devotes approximately 625 pages (including the biological technical report as an appendix) to the analysis of biological resources at Banning Ranch. This analysis is based on biological surveys conducted by BonTerra Consulting from 2008 through 2011 and by Glenn Lukos Associates, Inc. (i.e., the same firm that submitted the biological technical report in 2008), from 1998 to 2002 and 2006 to 2011. The material in the draft EIR is longer and more detailed than the 2008 draft biological technical report. It breaks down to the hundredth of an acre the precise vegetation types at Banning Ranch. It features multiple, color-coded maps identifying the various forms of vegetation. The analysis likewise bores into details concerning the animal life in Banning Ranch, using text and maps to provide an in-depth view of wildlife at Banning Ranch. And the draft EIR analyzes the effects of the Project on habitat, special status species, and other biological resources, using charts and maps to illustrate the impacts described in the textual analysis.

12

The draft EIR also describes the development proposal in depth, dividing the proposed uses of Banning Ranch down to the tenth of an acre. It specifies which oil production facilities and infrastructure would be removed, and which areas would continue to be used for oil production "on an interim basis." It pinpoints the areas of Banning Ranch that would be used as natural open space, public parks, residences, and mixed-use. It provides for circulation and parking improvements. Maps of Banning Ranch illustrate the planned development with color-coding and detailed labeling.

In discussing the Coastal Act, the draft EIR states: "The Project site is within the boundary of the Coastal Zone. . . . The Project is considered consistent with the applicable land use policies of the . . . Coastal Act. . . ." With regard to the Coastal Act's general rule prohibiting development of ESHAs, "[s]ection 4.6.4 of this [draft EIR] has identified and mapped the vegetation types and special status species occurrences known to occur within the Project Site. The Project and associated mitigation measures avoid, minimize, and compensate for the placement of development within these areas to prevent a substantial degradation of these areas or significantly disrupt habitat values. The determination of what areas would be regulated as ESHA would be made by the Coastal Commission as part of the [coastal development permit] process for the Project."

Thus, the draft EIR does not actually label sectors of Banning Ranch as ESHA or potential ESHA. Instead, after noting Banning Ranch's status as a deferred certification area within the City's coastal land use plan, the draft EIR defers to the Coastal Commission the determination of whether and to what extent ESHAs are present at Banning Ranch. The draft EIR repeatedly notes that the Project cannot go forward without a coastal development permit from the Coastal Commission, something the City could not provide at the Banning Ranch site. Indeed, the draft EIR acknowledges that multiple other federal, state, and local agencies will need to approve the Project before it can proceed.

13

*Response to Comments and Final Environmental Impact Report*

In March 2012, the final EIR was produced, collecting comments, responding to comments, issuing clarifications and revisions, and adopting additional appendices.  These new components added approximately 2,200 pages to the draft EIR, bringing the EIR grand total to over 9,000 pages.  We focus solely on those aspects pertinent to the issues raised in this appeal.

Negative comments concerning the draft EIR's failure to designate ESHAs were received from both the Conservancy's members and Coastal Commission staff.  We highlight several of the objections raised in the Coastal Commission's letter.  The letter first objects to the procedure contemplated by the City, recommending that the City consider the Project "in the context of a Local Coastal Program review" rather than the current plan to submit the Project for a coastal development permit without having undergone the initial review.  Noting "the scope and complexity of the proposed project," the letter suggests the City's proposed process would prove "unworkable."  The letter requests "that the EIR process incorporate a determination of probable ESHA areas and their required buffers" and further requests that the Coastal Commission's staff biologists have the opportunity to review such designations prior to EIR finalization.  The letter opines that a "preliminary analysis" indicates the Project proposed in the draft EIR could not be compatible with the Coastal Act, in part because a planned "four lane arterial road in the proposed location would result in significant, unavoidable impacts to ESHA."[11]

_____

[11]  The Conservancy suggests that the City's motivation for declining to identify ESHAs in the draft EIR stemmed from its desire to build roads that would necessarily infringe on ESHAs.  In February 2009 correspondence, Glenn Lukos Associates, Inc., noted that changes to the habitat restoration plan for Banning Ranch would be required as a result of "the proposed road circulation network requested by the City . . . as a public benefit. . . .  [T]he changes associated with the Proposed Project would significantly impact scrub, wetlands, and riparian habitat that would be considered [ESHA] pursuant to the City's Coastal Land Use Plan . . . Policies as well as the [Coastal Act].  It is important to note that impacts to ESHA are prohibited . . . except for certain allowable uses, and the proposed [road] connectors would be problematic to the [Coastal

The City responded to the critique that it should designate ESHAs as part of the CEQA process. The "purpose of an EIR is to analyze the impacts of a proposed project on the physical environment. The Draft EIR analyzes the proposed Project and its impact on biological resources . . . . In so doing, the City has fulfilled its obligation under CEQA to analyze the significant impacts of a project on the physical environment. To what extent these areas constitute ESHA — a concept unique to the Coastal Act — is a finding within the discretion of the Coastal Commission, or a local agency as part of its local coastal program certification process. While the Draft EIR must identify a project's impact on the environment, including biological resources such as sensitive species and sensitive native vegetation, it is not required to make a finding pursuant to the Coastal Act. That would be within the discretion and authority of the Coastal Commission when this Project comes before them. [¶] For other coastal projects, the Coastal Commission has identified a variety of habitats and resources as ESHA which include, but are not limited to, coastal bluff scrub, coastal sage scrub, riparian scrub, freshwater marsh, and habitat occupied by listed species. These habitats and resource, and many others, have been quantified, qualified, and graphically illustrated in the Draft EIR and supporting Biological Technical Report for the proposed Project. This technical information is available to the Coastal Commission for their consideration of ESHA in accordance with the Coastal Act."

In response to criticism that it should apply its coastal land use plan in the draft EIR, the City explained that Banning Ranch is not currently covered by the City's coastal land use plan. "Consequently, the Applicant is proposing to apply for a Coastal

Commission]." "The Proposed Project would include a north/south connection . . . that would cross through a large portion of project open space containing areas of ESHA as well as areas proposed for habitat restoration . . . ."

The four lane arterial road extension is proposed as consistent with the Orange County Transportation Authority's map of arterial networks. Included in the EIR is an analysis of an alternative that excludes the disputed road extension.

15

Development Permit to implement its proposed Project. The Coastal Commission's comments regarding the level of detail required for a Coastal Development Permit will be forwarded to the Applicant for its consideration in preparing its application to the Coastal Commission." The City also acknowledged in an additional response to comments that the Coastal Commission had already "identified areas of ESHA on the Project site" in an unrelated proceeding — a .21-acre portion and a .46-acre portion — but reiterated that "the Coastal Commission has not made an ESHA determination for the remainder of" Banning Ranch.

In short, the City stands by the position taken in the draft EIR: it is unnecessary for the City (whether under CEQA, the Coastal Act, or its own coastal land use plan) to identify ESHAs in the EIR.

*Approval of the Project*

On July 23, 2012, the City held a public hearing on the Project. At the conclusion of the hearing, the City adopted a series of resolutions, which, taken together, amounted to approval of the Project. Among other things, the resolutions: (1) certified the final EIR, (2) approved the Project's master development plan (and related entitlement changes), (3) approved zoning changes to Banning Ranch, and (4) approved the development agreement between the City and Project proponents.

The City found that the "Project would have direct and indirect impacts on habitat and special status species associated with oilfield remediation, grading, construction, and long-term use of the Project site. Grading activities could impact several sensitive natural communities on the Project site." But the impact of the Project on the biological resources at Banning Ranch "is Less Than Significant as a result of the implementation" of mitigation measures. The City also found that the "Project is consistent with the goals and policies of the General Plan."

16

*Procedural History of Mandamus Action*

In August 2012, the Conservancy petitioned for a writ of mandate on the grounds that the EIR was legally inadequate and the City violated its own general plan by approving the Project. The Conservancy requested that the City's approval of the Project be set aside and that the court order the City to comply with its legal obligations under CEQA and the Planning and Zoning Law.

The court took the matter under submission after briefing and oral argument. It granted the petition for writ of mandate in part, based on its conclusion "that the General Plan Amendment implementing the Project, and the Project itself, as approved, is inconsistent with the General Plan, particularly [land use policies] 6.3 and 6.4, and more specifically [land use policy] 6.5.6, in that the City failed to coordinate and work with the Coastal Commission in identifying which wetlands and habitats present in Banning Ranch would be preserved, restored or developed, prior to its approval of the Project." The court's analysis on this point was driven by *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603 (*Native Plant*).

The court denied relief to the Conservancy with regard to its CEQA allegations. The Conservancy's primary argument was "that the City failed to identify potential ESHAs on the Project site and deal with that potentiality in the EIR. [The Conservancy] uses that as a basis for arguing: 1) that the EIR did not properly describe the baseline; 2) that the EIR improperly deferred the identification and imposition of mitigation measures; 3) that the EIR did not contain a proper description of the Project; 4) that the EIR was based on incomplete data and analysis; 5) that the EIR had to be recirculated; and 6) that the EIR failed to adequately analyze alternatives." The court cited *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209 (*Banning Ranch I*) in rejecting the notion that CEQA requires a city to predict in its EIR the ESHAs that will be designated by the Coastal Commission in the future.

17

Judgment was entered and a peremptory writ of mandate issued in January 2014.  The writ of mandate stated in relevant part that the City "shall set aside and vacate all approvals relating to the Project except as to the approval of the environmental impact report and take no further steps toward approving or otherwise implementing the development of the Project site unless and until [the City] fully compl[ies] with Policy LU 6.5.6 in accordance with this Court's aforementioned determination."

DISCUSSION

*Consistency of Project with General Plan*

"We review decisions regarding consistency with a general plan under the arbitrary and capricious standard.  These are quasi-legislative acts reviewed by ordinary mandamus, and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair.  [Citations.]  Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it."  (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.)  "'It is, emphatically, *not* the role of the courts to micromanage these development decisions.'  [Citation.]  Thus, as long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance."  (*Native Plant*, *supra*, 172 Cal.App.4th at p. 638.)  We review the City's decision and do not defer to the trial court.  (*Id*. at p. 637.)[12]

---

[12] The Conservancy argues our level of deference to the City should be reduced because the City's general plan was endorsed by the voters in a referendum.  A similar argument was rejected, persuasively, in *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 515-516.

18

The primary general plan policy at issue is LU 6.5.6 (which can be described, consistent with the general plan, as a "policy," a "strategy," or both): "**Coordination with State and Federal Agencies** [¶] Work with appropriate state and federal agencies to identify wetlands and habitats to be preserved and/or restored and those on which development will be permitted." Also of note is LU 6.4, the alternative policy allowing development, pursuant to which the general plan requires "the preparation of a master development or specific plan for any development on the Banning Ranch specifying lands to be developed, preserved, and restored . . . ." A master development plan was approved by the City; this plan (among other documents) identifies lands to be developed, preserved, or restored as part of the Project.

The Conservancy's claim, accepted by the court, is that the City neither coordinated nor worked with the Coastal Commission (an "appropriate" state agency in LU 6.5.6) to identify wetlands and other habitats to be preserved, restored, or developed. The Conservancy insists that the only reasonable interpretation of the general plan is that the City must work with the Coastal Commission to decide the appropriate uses of habitats *before* Project approval. Recall that the general plan states, "Policies provide guidance to assist the City as it makes decisions relating to each goal. *Some policies* include guidelines or standards against which decisions can be evaluated." (Italics added.) The Conservancy asserts that LU 6.5.6 is just such a policy, and that the City's process leading up to the approval of the Project fell short of what LU 6.5.6 required, thereby making the Project inconsistent with the general plan. By the City's own admission, the Project has not yet received Coastal Commission assent. To the contrary, Coastal Commission staff in their comments to the draft EIR criticized (at least based on their preliminary review of the Project) the City's approach thus far (e.g., not analyzing the Project under the City's coastal land use plan, not identifying ESHA in the EIR, and allowing road improvements through areas that include probable ESHA).

19

The City's counterargument takes two tacks. First, the City marshals evidence of its interactions with federal and state agencies. The City distributed a Notice of Preparation of an EIR to a lengthy list of state agencies concerned with land use issues at Banning Ranch, including the Coastal Commission. Several of these agencies, including the Coastal Commission, provided comments to the City concerning the draft EIR. The National Marine Fisheries Service, a federal agency, attended a scoping meeting early in the environmental review process and provided oral comments. The United States Army Corps of Engineers concurred with a determination of its jurisdiction over certain wetlands at Banning Ranch. Consultation procedures under the Endangered Species Act were initiated with the United States Department of Fish and Wildlife.

City staff members and consultants even met with Coastal Commission staff about the Project and responded in some measure to Coastal Commission concerns. An in-person meeting occurred on March 30, 2011 at which various aspects of the proposed Project were discussed. In April 2011, instructions were provided to a biological resource consultant "to beef up" the EIR in some respect to address Coastal Commission concerns. Coastal Commission staff again met in person in 2012 with "Banning Ranch rep[resentatives] and advised them that we were not satisfied by the response to our comments in the [draft] EIR and advised them that they will need to fully address those comments if/when the project is submitted to the Commission. Since then, some of our staff including our staff biologists have had a staff visit and I believe they underscored the need for further study during that site visit."

Much of this evidence can fairly be characterized as compliance, in part, with LU 6.5.6. The City certainly worked with federal and state agencies, including the Coastal Commission, before approving the Project. But none of this evidence addresses the lack of coordination with the Coastal Commission prior to Project approval on the Project's identification of habitats for preservation, restoration, or development. Instead, the record seems clear that the Project's choices as to habitat preservation, restoration,

20

and development were made by the project proponents and the City. The Coastal Commission was certainly put on notice that the Project had been proposed and that an environmental review process had been initiated. The Coastal Commission (through its staff) took advantage of the opportunity to comment on the draft EIR and even met with Project proponents and the City on a few occasions. But it cannot fairly be said that the City worked with the Commission prior to Project approval to identify habitats for preservation, restoration, or development.

To this point, the City's second contention is that the Conservancy's interpretation of LU 6.5.6 is not the only reasonable interpretation, and that this court is required to defer to the City's interpretation of its own general plan in making its consistency finding. To wit, the City suggests compliance with LU 6.5.6 is not limited to its conduct prior to Project approval. LU 6.5.6 does not say that the Coastal Commission (or its staff) must sign off on the land uses contemplated by the Project before the City approves the Project. Instead, LU 6.5.6 asserts a vague strategy to "work with" all pertinent state and federal agencies. There is no temporal cut off for the completion of this vague strategy.

The City asserts its process is perfectly legitimate under LU 6.5.6: (1) "[w]ork with" all interested agencies to the extent of notifying them of the Project, meeting with agency representatives upon request, and taking their views into consideration during the Project review process; (2) approve (or not) the Project after completing CEQA requirements and measuring the Project for consistency with the general plan; and (3) continue to "[w]ork with" agencies from whom additional approvals and permits are necessary, including the Coastal Commission, which might determine that ESHA at Banning Ranch requires the Project to be altered. According to the City, it was free under LU 6.5.6 to reject the preferred procedure suggested by the Coastal Commission's comment letter, i.e.: (1) review the Project under the City's coastal local use plan, notwithstanding Banning Ranch's exclusion (as a deferred certification area)

21

from this plan; (2) identify in the Project planning documents all ESHAs within Banning Ranch; (3) eliminate any development that would affect an ESHA; (4) continue coordinating with Coastal Commission staff until the Project was up to snuff in the Coastal Commission staff's opinion; and (5) approve (or not) the Project.

In addition to its repeated acknowledgement that the Coastal Commission must provide a coastal development permit before the Project proceeds, the City also cites various mitigation measures included in the EIR as proof that it intends to "[w]ork with" the Coastal Commission in the future. Each of these measures references individual federal and state agencies (including the Coastal Commission) that must approve of the implementation plan for these measures to go into effect.

Our review of the general plan and the record in this case leads us to conclude that the City's interpretation of the process contemplated by LU 6.5.6 and its ensuing consistency finding are reasonable. This "strategy" (or policy) is simply too vague on its face to impose a mandatory requirement on the City that it complete an unspecified level of coordination with the Coastal Commission before the City's approval of the Project (e.g., by complying, in part or in full, with the suggestions provided by the Coastal Commission in its comment letter). Given the lack of measurable standards as to the extent or timing of the coordination required, it was rational for the City to conclude that LU 6.5.6 was designed as a helpful reminder of the City's legal obligations to "work with" all necessary agencies in the course of developing Banning Ranch.[13] This "work"

_____

[13] The trial court thought that LU 6.5.6 logically must mean something beyond simply complying with preexisting legal obligations (e.g., to notify appropriate agencies about the Project, to obtain necessary permits), else what would be the point of including it in the general plan? (See, e.g., Pub. Resources Code, §§ 30600, 30604 [coastal development permit issuance by Coastal Commission]; Cal. Code Regs., tit. 14, § 15086, subd. (a) [lead agency shall consult with and request comments from other agencies following preparation of draft EIR].) But not every sentence in a general plan creates a new legal obligation. Indeed, the City's general plan implicitly acknowledges that not every "Policy" creates guidelines or standards against which the City's behavior can be measured.

would, of course, center on the question of which segments of Banning Ranch would be preserved, which would be restored, and which would be developed. But it was up to the City to decide precisely how this strategy of working with concerned agencies would be implemented. The City's decision to forego additional engagement with the Coastal Commission prior to Project approval did not make the Project inconsistent with the general plan.

The trial court ruled to the contrary, applying what it deemed to be binding precedent. (See *Native Plant*, *supra*, 172 Cal.App.4th 603.) *Native Plant* held that Rancho Cordova violated its general plan by its failure to sufficiently coordinate with the United States Fish and Wildlife Service (the Service) in designing mitigation measures in connection with a development project. (*Id*. at p. 608.)

The *Native Plant* project concerned a 530 acre site at which a mix of development and preservation was proposed. (*Native Plant*, *supra*, 172 Cal.App.4th at p. 608.) The project site featured vernal pools and seasonal wetland vegetation, which

We have not been pointed to any authority indicating that the City is required under the Coastal Act to identify ESHA in a project not covered by a coastal land use plan. (See, e.g., Cal. Code Regs., tit. 14, § 13052 [setting forth minimum "preliminary approvals" before request for coastal development permit will be accepted for filing; list of requirements does not include ESHA designations].) The closest the Conservancy comes to supporting such a claim is the following section from the Coastal Act: "The commission shall, to the maximum extent feasible, assist local governments . . . . Similarly, every public agency, including . . . local governments, shall cooperate with the commission and shall, to the extent their resources permit, provide any advice, assistance, or information the commission may require to perform its duties and to more effectively exercise its authority." (Pub. Resources Code, § 30336.) The Conservancy reasons that once the Commission requested the City to do something in its comment letter, it was the City's obligation to follow up on the request. We agree with the City that an ESHA designation is a legal conclusion, not the sort of cooperation mandated by Public Resources Code section 30336. There is no authority for the proposition that the City violated its statutory duty to cooperate with the Coastal Commission by not including ESHA designations in its EIR. And regardless, there is not a Coastal Act claim before this court. This case is about the City's obligations under the general plan and CEQA.

23

provided "habitats for two species of vernal pool crustaceans — vernal pool fairy shrimp and vernal pool tadpole shrimp — that are listed as threatened and endangered (respectively) under the federal Endangered Species Act of 1973." (*Id*. at p. 609.) In the spring of 2004, the Service, in conjunction with other federal agencies, jointly created a "conceptual-level strategy" composed of principles and standards designed to protect aquatic resource habitats at the site. (*Id*. at p. 609.) Both after the proposed project was announced in September 2004 and after the release of the draft EIR in October 2005, the Service commented that the proposed project appeared to be inconsistent with the conceptual-level strategy endorsed by the Service. (*Id*. at pp. 610-612.) Rancho Cordova nonetheless approved the project. (*Id*. at p. 612.)

Among other contentions, it was argued that Rancho Cordova violated its general plan by failing to comply with Policy NR 1.7, which "provides that '[p]rior to project approval the City shall require a biological resources evaluation for private and public development projects in areas identified to contain or possibly contain listed plant and/or wildlife species based upon the City's biological resource mapping provided in the General Plan EIR or other technical materials.' To implement this policy, Action NR.1.7.1 provides that '[f]or those areas in which special-status species are found or likely to occur or where the presence of species can be reasonably inferred, the City *shall* require mitigation of impacts to those species that *ensure* that the project does not contribute to the decline of the affected species populations in the region to the extent that their decline would impact the viability of the regional population. Mitigation *shall* be designed by the City *in coordination with* the . . . Service . . . and the California Department of Fish and Game (CDFG), and shall emphasize a multi-species approach to the maximum extent feasible. This may include development or participation in a habitat conservation plan.'" (*Native Plant*, *supra*, 172 Cal.App.4th at p. 635.)

It was undisputed that the site contained special-status species. (*Native Plant*, *supra*, 172 Cal.App.4th at p. 639.) Rancho Cordova "[u]nquestionably" included

24

mitigation provisions in the project. (*Id*. at p. 640.) And there was sufficient evidence in the record for Rancho Cordova to reasonably conclude that its mitigation measures were consistent with the substantive requirements set forth in Action NR 1.7.1. (*Ibid*.) But Rancho Cordova did not coordinate with the Service in designing the project's mitigation measures. (*Id*. at pp. 640-642.) Rancho Cordova posited that its obligation to coordinate with the Service was met by consulting with the Service, i.e., by soliciting comments to the project and draft EIR, by considering those comments, and by responding to comments in the final EIR. (*Id*. at p. 641.) But, given the language in its general plan, the appellate court held it was unreasonable for Rancho Cordova to construe the words "coordination with" as meaning mere consultation. (*Ibid*.) "[W]e cannot reasonably deem this 'coordination' requirement satisfied by the mere solicitation and rejection of input from the agencies with which [Rancho Cordova] is required to coordinate the design of mitigation measures for the Project. Although our standard of review . . . is highly deferential, 'deference is not abdication.'" (*Id*. at p. 642.)

The Conservancy is correct that the City's level of interaction thus far with the Coastal Commission was closer to consultation than coordination, as defined in *Native Plant*. The Conservancy is also correct that, like the *Native Plant* case, the lack of coordination here could be counterproductive for the City in that the Coastal Commission could ultimately refuse to issue development permits. (See *Native Plant*, *supra*, 172 Cal.App.4th at p. 642 [reasoning that the Service's role in deciding whether the project would obtain a federal permit at the project site explained why the general plan would require pre-approval coordination with the Service].)

25

But the City's LU 6.5.6 is not as clear as Rancho Cordova's NR 1.7.1. In the context of discussing the substantive requirements for mitigation, NR 1.7.1 issues a specific command to Rancho Cordova to coordinate with a specific agency ("Mitigation *shall* be designed by the City *in coordination with* the . . . Service") to accomplish a specific task (i.e., the *design* of the mitigation measures). (*Native Plant*, *supra*, 172 Cal.App.4th at p. 635.) The mitigation at issue pertained to a biological resources evaluation that had to occur "prior to project approval." (Cf. *Endangered Habitats League*, *Inc. v. County of Orange*, *supra*, 131 Cal.App.4th at pp. 793-796 [mitigation measures cannot be deferred to date beyond EIR certification].)

In contrast, LU 6.5.6 (entitled "**Coordination with State and Federal Agencies**") does not compel coordination with the Coastal Commission prior to approval of the Project: "Work with appropriate state and federal agencies to identify wetlands and habitats to be preserved and/or restored and those on which development will be permitted." The Coastal Commission is not mentioned in the text or in the referenced implementation actions. There is no indication in LU 6.5.6 that this "work" must be completed before the City approves the Project. Whereas coordination in *design* suggests work done together at the beginning of the process, coordination in *identification* can be more naturally construed as an ongoing process. LU 6.5.6 is vague and ambiguous — the Conservancy's position depends on inferences made after considering multiple sections of the general plan; NR 1.7.1 is more resistant to multiple interpretations as to the timing of coordination. (Cf. *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1341 [county must comply with policy that is "fundamental . . . mandatory and anything but amorphous"].)

With that said, we acknowledge that *Native Plant* is not easily distinguished. Thus, to the extent the holding of *Native Plant* applies to this case, we reject its reasoning as incompatible with our deferential review of the City's legislative acts. After acknowledging the limits of its review (*Native Plant*, *supra*, 172

26

Cal.App.4th at pp. 637-638), the *Native Plant* court proceeded to fault the City for failing to give the proper interpretation to a vague term — "coordination with." But, recognizing that the general plan itself did not make clear what "coordination with" meant in practical terms, the appellate court declined to give guidance as to what Rancho Cordova needed to do to comply with the coordination requirement. "[W]e do not read this 'coordination' requirement as 'requir[ing] the City to *subordinate* itself to state and federal agencies by implementing their comments and taking their direction.' At the same time, however, we cannot reasonably deem this 'coordination' requirement satisfied by the mere solicitation and rejection of input from the agencies with which the City is required to coordinate the design of mitigation measures for the Project." (*Id*. at p. 642.) In other words, Rancho Cordova needed to do something in between consultation and capitulation. The appellate court declined to dictate the terms of the writ of mandate, leaving it to the trial court. (*Id*. at pp. 642-643.) Perhaps a good faith negotiation between Rancho Cordova and the Service should have occurred. Perhaps a minimum number of hours should have been devoted by Rancho Cordova toward reaching consensus with the Service. Perhaps the project developers should have been required to meet with the Service prior to submitting their project to Rancho Cordova. These might be good or bad ideas. But none of them were in the general plan. And any other specific requirement the trial court might have tried to impose would likewise by necessity be designed out of whole cloth.

The same problem played out here at the trial court. The writ of mandate issued by the court prevents the City from "approving or otherwise implementing the development of the Project site unless and until [the City] fully compl[ies] with Policy LU 6.5.6 in accordance with this Court's aforementioned determination." The aforementioned determination was that "the City failed to coordinate and work with the . . . Coastal Commission in identifying which wetlands and habitats present on the Project site would be preserved, restored or developed, prior to your approval of the

27

Project."  The court does not explain what it means, in practical terms, to coordinate and work with the Coastal Commission prior to project approval.  Presumably, it is something in between consultation and capitulation.  But the lack of specific guidance in the general plan indicates to us that it is unreasonable to find the City's view of LU 6.5.6 to be arbitrary.  It is improper for courts to micromanage these sorts of finely tuned questions of policy and strategy that are left unanswered by the general plan.  Cities are free to include clear, substantive requirements in their general plans, which will be enforced by the courts.  But courts should not invent obligations out of thin air.

*Adequacy of EIR Under CEQA*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.'  [Citation.]  Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'"  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426, fn. omitted.)  "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo."  (*Id.* at p. 427.)

"CEQA requires an EIR to reflect a good faith effort at full disclosure . . . ."  (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712.)  "Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment.  It is only against this baseline that any significant environmental effects can be determined."  (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952.)

28

The Conservancy contends the City violated CEQA by refusing to identify ESHAs in the EIR; all of its sub-arguments follow from this initial premise. The Conservancy claims the City consciously avoided making this determination because it was aware that a good faith effort in that direction could short circuit aspects of the Project that it wished to include (e.g., the extension of a road through ESHA). At least as early as December 2003, the City was on notice that determining which portions of Banning Ranch were ESHAs would be an important and controversial issue. Previous studies done by other agencies had determined that Banning Ranch included critical habitat for the California gnatcatcher and San Diego fairy shrimp. The initial biological study performed by Glenn Lukos Associates, Inc., in connection with the Project application indicated that ESHAs were present at Banning Ranch. The Coastal Commission's comments on the draft EIR specifically indicated that roads proposed as part of the Project "would result in significant, unavoidable impacts to ESHA." In short, an honest, good faith effort to categorize specific Banning Ranch habitats as ESHA (or not) may have necessitated a reworking of the Project.

The City's response is that an ESHA determination is a legal determination, ultimately made by the Coastal Commission in a project like the instant one (i.e., a project not covered by the City's coastal land use plan). (Cf. *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145 [no "requirement under CEQA that a public agency speculate as to or rely on proposed or draft regional plans in evaluating a project"].) All of the necessary data pertaining to biological resources and habitat at Banning Ranch is included in the EIR. The EIR describes the environmental impacts of the Project and mitigation measures designed to address those impacts. The Conservancy's complaint concerns the City's reluctance to draw a legal conclusion based on a review of the data, not the failure to include data or scientific analysis that would enable a decisionmaker to classify a habitat as ESHA.

29

The City's position is supported by our opinion in *Banning Ranch I*, *supra*, 211 Cal.App.4th at pages 1233-1234, which rejected a similar contention by the Conservancy pertaining to a separate project. In *Banning Ranch I*, the Conservancy argued that "the EIR failed to disclose the park project's inconsistency with the Coastal Act." (*Id*. at p. 1233.) The supposed inconsistency was that the EIR "stated no area of [the] project had been designated an ESHA, according to the City's coastal land use plan. It acknowledged two areas had 'the potential to be considered . . . ESHA[s] by the California Coastal Commission.'" (*Id*. at pp. 1233-1234.) The Conservancy claimed that "the Coastal Commission is 'highly likely' to designate the two areas as ESHAs, and will reject the attempted mitigation." (*Id*. at p. 1234.) This court's response was that it "remain[ed] to be seen" whether the Coastal Commission would designate the contested habitats as ESHAs. (*Ibid*.) "There are no inconsistencies at the moment; the EIR adequately flagged potential inconsistencies and addressed them in advance through proposed mitigation." (*Ibid*.)

Similarly, in the instant case, the City found the Project to be consistent with the policies of the Coastal Act. The main differences between the cases are that the City was not obligated to apply its coastal land use plan to Banning Ranch (unlike the park project at issue in *Banning Ranch I*) and the City opted not to speculate about *potential* ESHA at Banning Ranch in this case. Instead, the City simply deferred ESHA determinations to the Coastal Commission. This difference between the cases is unimportant for our purposes. The important point is that the City adequately flagged potential inconsistencies with the Coastal Act by emphasizing (1) that the Project was outside the scope of its coastal land use plan, and (2) that the Coastal Commission would determine whether ESHAs were affected by the Project. Clearly, it "remains to be seen" (*Banning Ranch I*, *supra*, 211 Cal.App.4th at p. 1234) whether the Coastal Commission will issue a development permit for the Project as currently constituted. CEQA does not

require the City to prognosticate as to the likelihood of ESHA determinations and coastal development permit approval.

## DISPOSITION

The judgment is reversed. The court shall set aside the peremptory writ of mandate issued on January 15, 2014, and enter a new judgment denying relief to the Conservancy. The City shall recover its costs on appeal.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

31