Filed 2/16/22  Affordable Clean Water Alliance v. Santa Clarita Valley etc. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| AFFORDABLE CLEAN WATER ALLIANCE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>SANTA CLARITA VALLEY SANITATION DISTRICT OF LOS ANGELES COUNTY,<br><br>     Defendant and Respondent. | B303831<br><br>(Los Angeles County Super. Ct. No. BS170983)<br><br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

The opinion filed on January 19, 2022, is modified as follows:

1.     On page 27, delete footnote 7 and replace with the following:

To the extent the Alliance argues that the doctrine of collateral estoppel did not bar it from challenging the District's failure to consider alternatives to the Chloride Compliance Project, that is, alternatives to removing chloride from the treated wastewater, it did not challenge the District's failure to consider any such alternatives in the trial court. "We do not consider new matters raised for the first time on appeal." (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 380, fn. 16.)

The petition for rehearing is denied. There is no change in judgment.

_____
BAKER, Acting P. J.          MOOR, J.          KIM, J.

Filed 1/19/22  Affordable Clean Water Alliance v. Santa Clarita Valley etc. CA2/5
(unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| AFFORDABLE CLEAN WATER ALLIANCE, <br><br>        Plaintiff and Appellant, <br><br> v. <br><br> SANTA CLARITA VALLEY SANITATION DISTRICT OF LOS ANGELES COUNTY, <br><br>        Defendant and Respondent. | B303831 <br><br> (Los Angeles County Super. Ct. No. BS170983) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

The Silverstein Law Firm, Robert P. Silverstein, James S. Link, and Naira Soghbatyan, for Plaintiff and Appellant.

Cox, Castle, & Nicholson, Michael H. Zischke, David P. Waite, and Alexander M. DeGood, for Defendant and Respondent.

## I. INTRODUCTION

Plaintiff Affordable Clean Water Alliance (the Alliance) appeals from a judgment denying its petition for writ of mandate. The Alliance asserted that the Santa Clarita Valley Sanitation District of Los Angeles County (the District) violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] when it certified a project to reduce the chloride levels in wastewater treated at its water reclamation plants. The trial court denied the petition. We affirm.

## II. BACKGROUND

A.    *The Initial Project and 2013 EIR*

The District is responsible for treating wastewater for the Santa Clarita Valley, which it accomplishes through its Valencia and Saugus water reclamation plants. The treatment process produces high-quality wastewater that is suitable for reuse. In 2013, a portion of the treated wastewater (referred to as recycled water) was reused and a portion was discharged into the Santa Clara River (the River).[2]

---

[1]    Further statutory references are to the Public Resources Code unless otherwise indicated.

[2]    Recycled water is treated wastewater that, instead of being discharged into the River, is reused by local communities.

2

Under the federal Clean Water Act and the California Porter-Cologne Water Quality Control Act, the California Regional Water Quality Control Board – Los Angeles Region (Control Board) regulates discharges into the River. In 2002, the Control Board adopted the Upper Santa Clara River Chloride Total Maximum Daily Load (Chloride TMDL) order, which set a chloride limit of 100 milligrams per liter for treated wastewater that was discharged from the District's reclamation plants into the River. The Control Board set a 2015 deadline for the District to comply with the Chloride TMDL order. The water reclamation plants, however, were not designed to remove chloride from treated wastewater.

In October 2013, the District prepared the Chloride Compliance Facilities Plan (the Initial Project) and Environmental Impact Report (2013 EIR). The objectives of the Initial Project were: to comply with the state-mandated chloride level limit; to create wastewater treatment facilities for chloride removal and future expansion of the Valencia water reclamation plant; and to "[p]rovide a wastewater treatment and effluent management program that accommodates recycled water reuse opportunities in the Santa Clarita Valley while protecting beneficial uses of the [River]."

The Initial Project consisted of two components: the Chloride Compliance Project, which addressed the first two objectives, and the Recycled Water Project, which addressed the third objective. The 2013 EIR discussed a range of alternatives to comply with the Chloride TMDL order and identified four final alternatives. Alternative 1 involved treating a portion of the wastewater at the Valencia water reclamation plant with microfiltration and reverse osmosis, a process that would produce

3

"a salty water byproduct called brine that require[d] proper disposal." Alternative 1 proposed disposing of the resulting brine via a pipeline to the Los Angeles Basin.

Alternative 2 was "similar to Alternative 1 except that brine would be disposed via [deep well injection] and [ultraviolet] disinfection would replace the existing chloride-based disinfection systems at both [water reclamation plants]."

Alternative 3 was "similar to Alternative 2 except that brine would be disposed via trucking to an unloading terminal" and would eventually flow into the ocean.

Alternative 4, known as Phased AWRM, consisted of two phases. Phase I involved the use of ultraviolet disinfection systems at both water reclamation plants, salt management facilities in Ventura County, and supplemental water. In the event Phase I could not provide consistent water quality in compliance with the Chloride TMDL order, Phase II provided for microfiltration and reverse osmosis, as well as disposal of brine via deep well injection. Alternative 4 was contingent on support by Ventura County stakeholders.

After evaluating these four alternatives, the District selected Alternative 4, with Alternative 2 serving as a back-up.

The 2013 EIR also discussed the Recycled Water Project component of the Initial Project. The District explained that each of the alternatives described in the 2013 EIR would include making recycled water available in quantities needed to support the Recycled Master Plan prepared by the Santa Clarita Valley Water Agency (Water Agency). That master plan made recycled water available for use by local municipalities and projected that the need for recycled water would increase over time as the population of the community using the water grew. Because any

4

treated wastewater that was used for the Recycled Water Master Plan would necessarily be diverted from discharge into the River, the 2013 EIR found that the Recycled Water Project "could result in a reduction in flow discharged by the [water reclamation plants] to the [River] under each alternative." The 2013 EIR considered the potential impact of the Recycled Water Project on the statutorily-protected unarmored threespine stickleback fish (stickleback) and concluded that even though "discharge of treated wastewater from the [water reclamation plants] to the [River] could decrease [because of the Recycled Water Project] . . . the combined [water reclamation plant] discharges would not be lower than the minimum flow of 13 [million gallons per day] identified to sustain the river's biological resources."

On October 24, 2013, Ventura County stakeholders notified the District by letter that they would not support Alternative 4. On October 28, 2013, the District's board certified the 2013 EIR and adopted Alternative 2.

B.     *Case No. BS145869*

On November 27, 2013, in case No. BS145869, the Alliance filed a petition for writ of mandate, alleging that the District had violated CEQA. The Alliance sought to compel the District to set aside its approval of the 2013 EIR.

On March 11, 2015, the District's board voted to abandon Alternative 2 as the deep well injection portion of this alternative was no longer viable.

On March 27, 2015, the Alliance filed a first amended petition, the operative pleading in case No. BS145869.

5

C.      *2016 Trucking SEIR*

On September 18, 2015, the District issued a notice of
preparation, and on November 17, 2015, it issued a notice of
availability for a Supplemental Environmental Impact Report for
Brine Concentration and Limited Trucking (2016 Trucking
SEIR).[3]  The first two objectives of the Revised Project were to
comply with the Chloride TMDL order "by the State's deadline[]";
and to use an existing industrial facility for brine disposal.  The
third objective was identical to the third objective of the Initial
Project.

Because Alternative 1 would not be completed in a timely
manner and Alternative 2 was no longer viable, the District
concluded that Alternative 3, with "enhanced brine concentration
technology" and limited trucking to an existing industrial facility
for brine disposal, was the best alternative for the Revised
Project.  The District noted that only Alternative 3 could be
implemented by July 1, 2019, the final deadline for compliance
with the Chloride TMDL order.  The District also stated that in
order to avoid delays, the Recycled Water Project would "no
longer [be] part of the currently recommended project" and
"would be separately considered by the [District] Board after
further environmental and public review in a separate CEQA
document."

---

[3]      For purposes of clarity, we will refer to the revised project
described in the 2016 Trucking SEIR as the "Revised Project."

6

D.    *Trial Court's Ruling in Case No. BS145869*

On December 7, 2015, the Alliance filed its memorandum of points and authorities in supports of its petition challenging the 2013 EIR in case No. BS145869.  The Alliance argued that the District:  had approved a project that was impermissible; violated the Department of Fish and Wildlife's directions; failed to provide substantial evidence that the stickleback would not be impacted by the Initial Project; failed to mitigate harm to the arroyo toad; and failed to provide a project description in compliance with CEQA.[4]

On February 23, 2016, the trial court granted the Alliance's petition in part.  Although it rejected the Alliance's argument that the District violated CEQA by approving Alternative 2, finding that the issue was moot because the District had abandoned that alternative, it agreed with the Alliance that the District had yet to approve Alternative 3.  Therefore, the court concluded that any project approvals must be set aside.

Regarding the stickleback, the trial court rejected the Alliance's assertion that the Department of Fish and Wildlife required the District to perform "a specific analysis of the stickleback in the [2013 EIR]."  The court, however, agreed with the Alliance that the 2013 EIR lacked substantial evidence to support a finding that the stickleback "will not be taken within the meaning of Fish and Game Code section 5515."

---

[4]    In the first amended petition in case No. BS145869, the Alliance alleged that the District failed to analyze a reasonable range of project alternatives.  This argument was not raised in its memorandum of points and authorities before the trial court.

7

The trial court found against the Alliance regarding the lack of mitigation measures to protect the arroyo toad and the project description in the 2013 EIR.

The trial court granted the Alliance's petition in part as follows: "(1) the [2013 EIR] lacks substantial evidence for its conclusion of no significant impact (no take) on stickleback populations, and (2) since the District has abandoned Alternative 2 and there is as yet no approved Project for Alternative 3, the Project approvals must be set aside."

On March 9, 2016, the trial court issued the judgment in case No. BS145869. The court directed the District to: decertify the 2013 EIR; set aside and invalidate all project approvals; and "[r]efrain from taking any steps to carry out the [Initial] Project until and unless [the District] has fully complied with CEQA, all other applicable laws, and the writ, and the writ has been discharged." On March 17, 2016, the court issued the peremptory writ of mandate. The District was directed to file a return on the writ. No appeal was taken from the judgment.

E.     *The District Certifies 2016 Trucking SEIR and the Alliance Challenges the District's Return on the Writ*

On March 23, 2016, the District decertified the 2013 EIR and vacated the associated project approvals. The District then re-certified the 2013 EIR as augmented by the 2016 Trucking SEIR.[5]

---

[5]     On April 20, 2016, the Alliance filed a second petition for writ of mandate in case No. BS161742, alleging that the 2016 Trucking SEIR violated CEQA. On September 26, 2017, the trial court granted the District's motion to dismiss case No. BS161742

On April 14, 2016, the District filed a return to the writ in case No. BS145869, asserting that it had fully complied with the writ by decertifying the 2013 EIR and approving the 2016 Trucking SEIR.

On May 10, 2016, the Alliance filed a motion challenging the return to the writ and requesting that the writ of mandate be maintained.

On June 2, 2016, the trial court granted the Alliance's motion, finding that the District failed to "present evidence why the [Initial] Project is severable into two components and why doing so will not affect the CEQA reporting process. . . . In the District's words, it must show that the water recycling component's effects will not change the scope or nature of the chloride compliance component. " (Fn. omitted.) The court concluded that the District violated CEQA's procedural requirements by separating the Initial Project's two components (Chloride Compliance Project and Recycled Water Project) without public input. The court ordered the District "to reconsider its return to the writ and file an additional Return when it has certified an EIR for the [Initial] Project in a manner that complies with CEQA."

F.    *Notice of Preparation for Supplemental EIR of Recycled Water Project*

On August 4, 2016, the District issued a notice of preparation for a project entitled "Santa Clarita Valley Sanitation District Supplemental Environmental Impact Report

—————————

as moot because, as discussed below, the District subsequently decertified the 2016 Trucking SEIR.

9

for Study of Impacts to the Unarmored Threespine Stickleback Fish Under Reduced Discharge Conditions from the Santa Clarita Valley Sanitation District's Water Reclamation Plants" (Recycled Water Project SEIR). The Recycled Water Project SEIR's purpose was to evaluate the potential impact on the stickleback from the reduced wastewater discharge into the River caused by the Recycled Water Project. In the notice, the District stated, among other things, that "[t]he production and disposal of brine produced at Valencia [water reclamation plant] would reduce discharge to the [River], which supports special-status species. Increased use of recycled water could also reduce discharge to the [R]iver."

G.    *2017 Recirculated EIR*

On February 17, 2017, the District issued a notice of preparation for the "Recirculated Santa Clarita Valley Sanitation District Chloride Compliance Project Environmental Impact Report – Separation of Recycled Water Project" (2017 Recirculated EIR). The 2017 Recirculated EIR incorporated and used prior environmental analyses from the 2013 EIR and 2016 Trucking SEIR and considered whether new information or changed circumstances required any update to the prior analyses. The District sought comments for the new content of the 2017 Recirculated EIR only.

On August 30, 2017, the District: decertified the 2013 EIR and the 2016 Trucking SEIR; certified the 2017 Recirculated EIR; and approved the Chloride Compliance Project.

The 2017 Recirculated EIR explained that the objectives of the proposed project, which was now comprised of just the

10

Chloride Compliance Project, were to provide compliance with the Chloride TMDL order and to use an existing industrial facility for brine disposal. The District determined that separation of the Recycled Water Project and the Chloride Compliance Project "would generally lessen impacts on environmental resources as there would be no significant changes to current operations." The 2017 Recirculated EIR included updated analyses for: air quality, biological resources, hydrology and water quality, cumulative impacts, alternatives, growth inducement, and water resources. For all other resource areas previously studied in the 2013 EIR and 2016 Trucking SEIR, the 2017 Recirculated EIR found that "[n]o impacts would result" from separately implementing the Chloride Compliance Project and Recycled Water Project.

In discussing project alternatives, the District found that "[n]one of the alternatives evaluated in the 2016 Trucking SEIR . . . relied upon the Recycled Water Project." Two of the alternatives initially discussed in the 2013 EIR relied upon the Recycled Water Project, but had been rejected as infeasible and the analysis that rejected those alternatives still applied.

The 2017 Recirculated EIR concluded that the "the environmental impacts of the construction and operation of the proposed Chloride Compliance Project do not change as a result of separating the Recycled Water Project from the proposed project. Therefore, the previous alternative analysis contained in the 2013 EIR and the 2016 Trucking SEIR . . . are still applicable and cover the reasonable range of alternatives required by CEQA. The 'no project' alternative would not meet the objective of complying with the State-mandated Chloride TMDL. The alternative of maintaining both the Chloride Compliance Project

11

and the Recycled Water Project under the cover of one CEQA document does not meet the objective of compliance by [the District], in as timely a manner as is feasible, with the Chloride TMDL for its wastewater and discharge facilities."

## H.   *Case No. BS170983*

On September 1, 2017, the Alliance filed its petition for writ of mandate in case No. BS170983, the petition at issue in the instant appeal.  The Alliance alleged causes of action for violation of CEQA and requested a writ of mandate to invalidate the Chloride Compliance Project approvals and the 2017 Recirculated EIR.  The Alliance asserted, among other things, that:  the District engaged in piecemeal review (piecemealing) of the Chloride Compliance Project and the Recycled Water Project; the alternatives analysis for the Chloride Compliance Project was inadequate; and the cumulative environmental impacts analysis of the Chloride Compliance Project and the Recycled Water Project pertaining to the stickleback was inadequate.

## I.   *Partial Return to and Partial Discharge of Writ*

On September 22, 2017, the District filed a partial return to the writ in case No. BS145869 and moved for an order to partially discharge the writ.  The Alliance moved to challenge the return and sought an order to enforce the writ.  On October 24, 2017, the trial court heard and granted the District's motion and denied the Alliance's motion.  The court discharged the writ as it pertained to the Chloride Compliance Project, finding that the 2017 Recirculated EIR complied with the writ.

The court "retain[ed] jurisdiction over the remaining issue in the writ: an environmental review of the impacts to the stickleback caused by the Recycled Water Project, if that project goes forward."

J.    *The District's Rejection of Recycled Water Project and Full Discharge of Writ*

On February 25, 2019, the District issued a resolution that it had: ceased its planning efforts on the Recycled Water Project; withdrew the notice of preparation for the Recycled Water Project SEIR; and rejected the Recycled Water Project. The District concluded that the studies necessary to address the impact on the stickleback because of flow diversion and reduced discharges, coupled with the associated resource agency approvals for the flow diversion and reduced discharge, would not be timely or cost effective for ratepayers. The outcome of the project was also uncertain because of the probability of future litigation.

On April 26, 2019, the District filed another return to the writ. The District asserted that it had addressed the remaining issue encompassed by the writ by rejecting the Recycled Water Project. The District also moved for the writ to be discharged. On May 21, 2019, the trial court granted the District's motion, concluding that the writ was fully discharged.

K.    *Trial Court Denies Petition in Case No. BS170983*

On July 17, 2019, the Alliance filed its memorandum of points and authorities in support of its petition in case No. BS170983. It argued, among other things, that the District had:

failed to identify and analyze feasible alternatives in the 2017 Recirculated EIR; piecemealed the Recycled Water Project and the Chloride Compliance Project; and failed to analyze cumulative impacts properly.

The Alliance raised three different arguments in support of its claim that the 2017 Recirculated EIR failed to identify and analyze feasible alternatives.  First, it argued that, because the 2013 EIR had rejected some alternatives as not being able to meet an earlier May 2015 deadline for compliance with the Chloride TMDL order, and that deadline had been extended, the use of the 2013 EIR's analysis was no longer "current" and needed to be updated.  Second, it argued that the 2017 Recirculated EIR did not adequately discuss alternatives to separating the Recycled Water Project from the Chloride Compliance Project.  And, third, the Alliance contended that the 2017 Recirculated EIR failed to identify a preferred alternative.

Regarding cumulative impacts, the Alliance argued that the 2017 Recirculated EIR failed to analyze the impact of the Recycled Water Project on biological resources like the stickleback.  The Alliance contended that because the Recycled Water Project was listed as a related project, a cumulative impact analysis was necessary.

In support of its argument that the District had engaged in piecemealing, the Alliance asserted that the Chloride Compliance Project and the Recycled Water Project were part of one project that the District had ""chopp[ed]"" into smaller ones, in an attempt "to defer or avoid identifying, analyzing, and mitigating impacts" of the project.

14

On August 23, 2019, the District filed its opposition, asserting, among other things, that: the petition was moot because the Recycled Water Project had been abandoned by the District; and res judicata and collateral estoppel principles barred the Alliance's assertions as the trial court had mostly upheld the Chloride Compliance Project in case No. BS145869.

On September 26, 2019, the trial court heard oral argument on the petition in case No. BS170983.[6] On October 11, 2019, the court issued its decision denying the petition.

While the trial court rejected the District's res judicata arguments, the court found that the Alliance was "collaterally estopped from litigating any issue raised in [case No. BS145869] concerning the Chloride Compliance Project, with the exception of the Brine Trucking component and updates to the 2013 EIR." The court noted that there were only two deficiencies in the 2013 EIR: "(1) a lack of sufficient analysis on potential impacts to the stickleback fish; and (2) a lack of an alternative for brine management. . . . The court found no fault with the other components of the Chloride Compliance Project and thus the writ was granted only in part." The court found that collateral estoppel applied because "the parties are identical, the issues concerning the Chloride Compliance Project were actually litigated and necessarily decided in [case No.] BS145869, and the court's decision was not appealed and is final on the merits."

---

[6]    Although a court reporter was present at the hearing on September 26, 2019, due to a catastrophic "malfunction" of equipment, she was unable to prepare a transcript of the proceedings. The record therefore does not include a reporter's transcript of the proceedings. Nor does it include a suitable substitute such as a settled or agreed statement.

Regarding the Alliance's piecemealing argument, the trial court rejected it as moot. The court found that because the District had abandoned the Recycled Water Project, there were no longer two components to the Project.

The trial court also rejected the Alliance's cumulative impacts argument. Citing California Code of Regulations, title 14, section 15130, subdivision (a)(1), the court ruled: "As the [2017 Recirculated EIR] states, the Chloride Compliance Project simply has no impacts—biological resource or otherwise—that accumulate with those of the Recycled Water Project. The Chloride Compliance Project will not result in any reduction of effluent discharge, the biological impacts of which were the only impact not sufficiently addressed in the 2013 EIR. Since the Chloride Compliance Project will not reduce water flow in the River, there are no cumulative impacts to resolve." The court added, "[s]ince the Chloride Compliance Project will not have any biological resources impacts that accumulate with the Recycled Water Project, no cumulative impacts analysis is needed on that issue."

The trial court rejected the Alliance's argument that the 2017 Recirculated EIR's reuse of the prior alternatives analysis from the 2013 EIR and the 2016 Trucking EIR was outdated and therefore invalid. The court found that "[the Alliance] fails to meet its burden of presenting substantial evidence that the passage of the [Chloride TMDL order] deadline is significant new information that requires an update of the alternatives analysis. [The Alliance] presents no evidence that the [Control Board] waived . . . the [Chloride TMDL order] deadline, and the history of [case No. BS145869] suggests the [Control Board] would not waive it. Thus, the urgency which caused the 2013 EIR to reject

16

alternatives remains in place, or at least [the Alliance] has not shown otherwise."

The trial court also rejected the Alliance's argument that the District failed to consider other alternatives to separation of the Recycled Water Project from the Chloride Compliance Project. It disagreed with the District's contention that the doctrine of collateral estoppel barred the Alliance from pursuing this argument, stating that the Alliance was "not barred from challenging alternatives to the separation of the Chloride Compliance Project from the Recycled Water Project." Nonetheless, the court concluded that the Alliance's challenge was moot because the District had abandoned the Recycled Water Project.

Finally, the trial court rejected the Alliance's argument that the 2017 Recirculated EIR failed to designate a preferred alternative as required by CEQA. The court noted that the preferred alternative was the Chloride Compliance Project and "the [2017 Recirculated EIR] found there [were] no other feasible alternatives from which to choose."

On December 4, 2019, the trial court entered judgment. The Alliance timely appealed.

## III. DISCUSSION

### A. *CEQA*

CEQA "and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq. [(CEQA Guidelines)]) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to:  [¶]  (1) Inform governmental

17

decision makers and the public about the potential, significant environmental effects of proposed activities.  [¶]  (2) Identify ways that environmental damage can be avoided or significantly reduced.  [¶]  (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible.  [¶]  (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.'"  (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286, fn. omitted.)

"'"The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language."'  [Citations.] 'With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment.  [Citations.]' [Citations.]  The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.'  [Citations.]  'Because the EIR must be certified or rejected by public officials, it is a document of accountability.  If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.'  [Citation.]  The EIR 'protects not only the

18

environment but also informed self-government.'" (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512, fn. omitted (*Sierra Club*).)

"The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion. . . . '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. [Citation.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." [Citation.]' [Citation.]" (*Sierra Club, supra*, 6 Cal.5th at p. 512.)

"'Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise.'" (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 613.)

B.    *Cumulative Impact Analysis*

The Alliance contends the trial court erred by finding that no cumulative impacts study on the stickleback was necessary for

the 2017 Recirculated EIR. "[S]ection 21083, subdivision (b), provides that the CEQA guidelines . . . should address a situation in which '[t]he possible effects of a project are individually limited but cumulatively considerable. As used in this paragraph, "cumulatively considerable" means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.' ([] § 21083, subd. (b)(2),italics [removed].)" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 523.)

Although the Alliance contends that the trial court "misconstrued" CEQA Guidelines section 15130, subdivision (a)(1), and asserts the error requires de novo review on appeal, at bottom, it challenges the court's factual finding that "[s]ince the Chloride Compliance Project will not reduce water flow in the River, there are no cumulative impacts to resolve." According to the Alliance, "[t]he record before the Court is otherwise"; and, it cites in support the notice of preparation from the 2016 Recycled Water SEIR, in which the District stated that "'[t]he production and disposal of brine produced at Valencia [water reclamation plant] would reduce discharge to the [River].'" A notice of preparation, however, is not a factual finding. Rather, it is the means by which the lead agency provides notice to "all responsible agencies and the state Office of Planning and Research. These agencies then have 30 days to specify the scope and content of information to be included. ([] § 21080.4; [CEQA Guidelines], § 15082.) With this input, the lead agency prepares a draft EIR ([] § 21100) and circulates it for public review and comment ([] § 21091; [CEQA Guidelines], § 15087)." (*Tuolumne*

20

*Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038.)  The factual finding by the District, as set forth in the 2017 Recirculated EIR, is that the Chloride Compliance Project would *not* reduce the quantity of wastewater discharge into the River and thus would not impact any special status species.  Specifically, the District found that:  "The separation of the Recycled Water Project from the Chloride Compliance Project would eliminate the potential diversion of approximately 5 [million gallons per day] from the [Valencia water reclamation plant] discharge to the [River].  The combined discharge from the [Valencia and Saugus water reclamation plants] would remain essentially at the current rate of 18 [million gallons per day].  As a result, the Chloride Compliance Project would not impact any special-status species or their habitat within the [River] because the discharge conditions would be essentially the same as current conditions."  When, as here, substantial evidence supports the District's conclusions, we defer to the agency's factual findings.  (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

　　We next consider the Alliance's related argument that the District was nonetheless required to conduct a cumulative impact study because the Recycled Water Project was "a reasonably foreseeable" future project.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396.)  "[M]ere awareness of proposed expansion plans or other proposed development does not necessarily require the inclusion of those proposed projects in the EIR.  Rather, these proposed projects must become 'probable future projects.'  (CEQA Guidelines, § 15130(b)(1)(A).)"  (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1127 (*Gray*).)  "'[P]robable future projects' can

21

be interpreted as reasonably probable future projects. . . . [P]rojects that are undergoing environmental review are reasonably probable future projects. [Citation.] We conclude that any future project where the applicant has devoted significant time and financial resources to prepare for any regulatory review should be considered as probable future projects for the purposes of cumulative impact." (*Gray, supra,* 167 Cal.App.4th at pp. 1127–1128.)

In support of its contention that the Recycled Water Project was reasonably foreseeable, the Alliance cites to the District's statement that it "anticipates that [the Water Agency] will take primary responsibility for watershed management planning, including consideration, planning and implementation of any recycled water reuse opportunities, and that to the extent [the Water Agency] decides to proceed with any projects, [the Water Agency] will act as lead agency in any such efforts." We disagree with the Alliance's characterization of this statement. At best, it reflects that the Water Agency would be the lead agency on *any* future project involving recycled water reuse *if* the Water Agency decided to proceed with such a project. The statement does not, on its own, render the Recycled Water Project reasonably foreseeable. Nor does the record demonstrate that the Recycled Water Project has undergone any environmental review by the Water Agency; or that the Water Agency will proceed with the Recycled Water Project as currently defined, that is, by diverting treated wastewater produced from the Chloride Compliance Project toward the local communities. On this record, whether the Recycled Water Project will proceed is speculative, and CEQA does not require a cumulative impacts analysis. (*Gray, supra,* 167 Cal.App.4th at pp. 1127–1128.)

C.    *Piecemealing*

The Alliance also argues that the District conducted an improper piecemealing of the Project.  "'CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . .  [¶]  . . .  [¶]  . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  [Citation.]  [¶]  The statutory definition is augmented by the [CEQA] Guidelines . . . , which define a "project" as "*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ."'  [Citation.]"  (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1220 (*Banning Ranch*).)  "Accordingly, 'CEQA forbids "piecemeal" review of the significant environmental impacts of a project.'  [Citation.]  Agencies cannot allow 'environmental considerations [to] become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.'  [Citation.]"  (*Id.* at p. 1222.)

We agree with the trial court that any argument of piecemealing related to the Recycled Water Project has been rendered moot by the District's decision not to proceed with the Recycled Water Project.  "'California courts will decide only justiciable controversies.  [Citations.]  The concept of justiciability is a tenet of common law jurisprudence and

embodies "[t]he principle that courts will not entertain an action which is not founded on an actual controversy . . . ." [Citations.] Justiciability thus "involves the intertwined criteria of ripeness and standing.  A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made."  [Citation.] But "ripeness is not a static state" [citation], and a case that presents a true controversy at its inception becomes moot "'if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character'" [citation].'  [Citation.]  Stated differently, moot cases 'are "[t]hose in which an actual controversy did exist but, by the passage of time or a change in circumstances, ceased to exist." [Citation.]' [Citation.]" (*Parkford Owners for a Better Community v. County of Placer* (2020) 54 Cal.App.5th 714, 722.) We review a finding of mootness de novo. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582.)

As discussed, piecemealing violates CEQA because it has the potential to disguise the cumulative impact of a project by chopping it into smaller projects. (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1222.)  However, if one of those smaller projects has been rejected from the project as a whole, the question of piecemealing becomes moot.  (See § 21080, subd. (b)(5) ["This division [referring to CEQA] does not apply to any of the following activities:  [¶]  . . .  [¶]  Projects which a public agency rejects or disapproves"].)  Here, there is no longer an actual controversy that the Recycled Water Project will have a cumulative impact with the Chloride Compliance Project because the two components will proceed independently of each other

24

(and, in the case of the Recycled Water Project, may not proceed at all). Thus, the question of piecemealing is moot.

Even if we were to consider the merits of the Alliance's argument, we find no piecemealing. We independently determine whether improper piecemealing is occurring. (*Banning Ranch, supra*, 211 Cal.App.4th at p. 1224.)

As described in *Banning Ranch, supra*, 211 Cal.App.4th 1209, there are two lines of cases where courts have found improper piecemealing: "First, there may be improper piecemealing when the purpose of the reviewed project is to be the first step toward future development. . . . [¶] And there may be improper piecemealing when the reviewed project legally compels or practically presumes completion of another action." (*Id.* at p. 1223.) "On the other hand, two projects may properly undergo separate environmental review (i.e., no piecemealing) when the projects have different proponents, serve different purposes, or can be implemented independently." (*Ibid.*)

On this record, we find that the District did not engage in piecemealing. The two objectives of the Chloride Compliance Project as stated in the 2017 Recirculated EIR are compliance with the Chloride TMDL order and use of an existing industrial facility to dispose of the resulting brine. Under the Chloride Compliance Project, the District will discharge the treated wastewater produced from the Chloride Compliance Project into the River. The Recycled Water Project, by contrast, would increase the distribution of recycled water for use by local municipalities by diverting the treated wastewater that would have otherwise been discharged into the River. In other words, the Recycled Water Project involves the end-product of the Chloride Compliance Project. Accordingly, the Recycled Water

25

Project is not necessary for the Chloride Compliance Project to proceed as stated in the 2017 Recirculated EIR. Thus, the Chloride Compliance Project can be implemented without the Recycled Water Project.

D.    *Project Alternatives*

Finally, we consider the Alliance's argument that the trial court erred by purportedly finding that its challenges to the alternatives analysis in the 2017 Recirculated EIR were subject to collateral estoppel. Our review of the record demonstrates that the court did not reject the Alliance's alternatives argument on collateral estoppel grounds. The Alliance raised three arguments regarding project alternatives below. Specifically, it argued that: (1) the 2013 EIR's project alternative analysis was "outdated" because the deadline for complying with the Chloride TMDL order was extended and the 2013 EIR's analysis therefore required updating; (2) the 2017 Recirculated EIR failed to analyze reasonable alternatives to separation of the Recycled Water Project from the Chloride Compliance Project; and (3) the 2017 Recirculated EIR failed to identify the preferred project alternative. On appeal, the Alliance does not challenge the trial court's rulings on its first and third arguments. And, contrary to the Alliance's contention, the court expressly found that the doctrine of collateral estoppel did *not* bar the Alliance from "challenging alternatives to the separation of the Chloride Compliance Project from the Recycled Water Project." The court instead rejected the Alliance's argument on mootness grounds. The Alliance has failed to raise any challenge to the court's mootness ruling and has therefore forfeited any argument on

appeal.  (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 555 ["And even in a CEQA case, "'[t]he most fundamental rule of appellate review is that an appealed judgment or order is presumed to be correct."  [Citation.]  It is the appellant who bears the burden of overcoming that presumption'"].)[7]

---

[7]     To the extent the Alliance argues that the doctrine of collateral estoppel did not bar it from challenging the District's failure to consider alternatives to the Chloride Compliance Project, that is, alternatives to removing chloride from the treated wastewater, it did not make any such challenge in the trial court.  "We do not consider new matters raised for the first time on appeal." (*Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 380, fn. 16.)

## IV.  DISPOSITION

The judgment denying the Affordable Clean Water Alliance's petition for writ of mandate is affirmed.  The Santa Clarita Valley Sanitation District of Los Angeles County is entitled to costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

BAKER, Acting P. J.

MOOR, J.